EXXON MOBIL CORPORATION, Appellant,

v.

Dan GILL, Individually, and As Successor in Interest to Dan Gill, Inc., d/b/a Dan Gill Exxon, Patrick T. Morrow, Individually, and as Successor in Interest to Carrollton Exxon, f/d/b/a Carrollton Exxon, Josey Lane Petroleum, Inc., d/b/a Carrollton Exxon, Appellees.

No. 13–06–048–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

April 12, 2007.

David M. Gunn, Russell S. Post, John S. Adcock, Beck, Redden & Secrest, L.L.P., Houston, Richard C. Godfrey, Mark S. Lillie, Andrew A. Kassof, Kirkland & Ellis, Chicago, IL, J.A. 'Tony' Canales, Canales & Simonson, P.C., Corpus Christi, for appellant.

David T. Bright, Watts Law Firm, Corpus Christi, Walter C. Thompson, Jr., James M. White, III, Barkley & Thompson, New Orleans, LA, William Large, Hosie, Frost, Large & McArthur, Anchorage, AK, William Denton, Biloxi, MS, Robert C. Josefsburg, Miami, FL, James P. Roy, Bob F. Wright, Lafayette, LA, Fredric Levin, Troy Rafferty, Pensacola, FL, Bruce Wecker, Spencer Hosie, Hosie, Frost, Large & Arthur, San Francisco, CA, William Hoese, Kohn, Swift & Graf, Philadelphia, PA, for appellees.

Before Justices YAÑEZ, RODRIGUEZ, and GARZA.

## OPINION

Opinion by Justice GARZA.

Exxon Mobil Corporation ("Exxon") has filed this interlocutory appeal from the trial court's order certifying a statewide class of plaintiffs in a breach of contract action for money damages. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(3) (Vernon Supp.2006) (allowing interlocutory appeal of class certification orders); Tex.R. Civ. P. 42(b)(3) (providing for certification of class based on predominance of common questions). We affirm the order.

### I. Background[1]

This case was brought in 2003 by three current and former Exxon service-station dealers—Dan Gill, Howard Granby, and Patrick Morrow—who had participated in certain Exxon rebate programs in the 1990s. Exxon's rebate programs took two basic forms: ones that were volume-based (how much gasoline a dealer sold), and others based on how a dealer operated and maintained his station (for example, keeping a station open 24–hours–a–day). Exxon's volume-based programs included "RASPP" (Retail Auto Store Performance Program), "VIP" (Volume Incentive Program) and "SVIP" (Supreme Volume Incentive Program). A dealer could qualify for rebates under these programs if the dealer's sales surpassed a preset threshold. Exxon set the volume threshold requirements individually based on each dealer's own "historical volume, competitiveness, image, service, appearance, merchandising, promotional activity, and hours of operation." Under the "Hours of Operation" rebate program, Exxon paid dealers rebates for staying open 24 hours a day, while other dealers received smaller rebates when operating fewer hours.

---

1. The following facts are provided in Exxon's appellate brief and are uncontested by the named plaintiffs on appeal. *See* Tex.R.App. P. 38.1(f).

Notably, each dealer's standardized sales contract with Exxon has an "open price" term, which allows Exxon to change its per-gallon sales prices "on a near-constant, often daily basis" in response to the "intensity of retail competition." The price charged to dealers under the contracts is known as the "DTT price" (dealer tank truck price).

In this lawsuit, the named plaintiffs complain that Exxon cheated them out of the economic benefit of the rebates by adding the average per-gallon cost of the rebate programs to the DTT price of gasoline. They have sued Exxon for three causes of action related to the rebate programs: breach of contract regarding the DTT prices charged under their sales agreements, breach of the duty of good faith and fair dealing, and breach of the promise to provide economic benefits under the rebate programs.

On motion of the named plaintiffs, the trial court certified a class consisting of "all persons, partnerships, corporations, associations and entities which are and/or were at the material times Exxon-branded retail service station dealers who owned or operated Exxon branded retail motor fuel stores in the state of Texas and who entered into a standardized contract or agreement with ExxonMobil ... [, with] material times [meaning] the period during which the rebate programs ... were in effect in Texas."

In a 34–page order certifying the statewide class, which we have attached as an appendix to this opinion, the trial court recounted the proceedings leading to the certification order and gave both a summary of the case and an overview of the evidence, arguments, motions, and briefs presented and discussed during the certification hearing. *See* Class Certification Order, appendix. The court's order also provides a lengthy evaluation of how the named plaintiffs have met the requirements for class certification under Rule 42(a) and (b)(3). *See* Tex.R. Civ. P. 42(a), (b)(3). The order includes findings of fact and conclusions of law on the specific requirements for class certification. In addition, the order discusses Exxon's objections to class certification and explains the trial court's grounds for overruling the objections. The order includes a seven-page trial plan, which outlines a proposal for trying both the class's claims against Exxon and Exxon's defenses to the claims.

## II. Class Certification under Rule 42

■ Texas Rule of Civil Procedure 42 governs class certification. Tex.R. Civ. P. 42. Rule 42 is patterned after Federal Rule of Civil Procedure 23, and federal decisions and authorities interpreting current federal class action requirements are persuasive authority for Texas courts. *Southwestern Ref. Co. v. Bernal,* 22 S.W.3d 425, 433 (Tex.2000) (citing *RSR Corp. v. Hayes,* 673 S.W.2d 928, 931–32 (Tex.App.-Dallas 1984, writ dism'd)). All class actions must satisfy four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). *Id.* (quoting Tex.R. Civ. P. 42(a)). In addition to these prerequisites, class actions must satisfy at least one of the three subdivisions of Rule 42(b). *Id.* (citing Tex.R. Civ. P. 42(b)).

## III. Standard of Review

■ We review class certification orders for abuse of discretion. *Henry*

*Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 691 (Tex.2003) (citing *Bernal,* 22 S.W.3d at 439).[2] Actual, demonstrated compliance with Rule 42 is required for certification. *Id.* The trial court must perform a rigorous analysis and provide a specific explanation for how class claims will proceed to trial. *Id.* at 689 (citing *Bernal,* 22 S.W.3d at 439). A trial plan is required in every class certification order "to allow reviewing courts to assure that all requirements for certification under Rule 42 have been satisfied." *BMG Direct Mktg. v. Peake,* 178 S.W.3d 763, 778 (Tex.2005); *State Farm Mut. Auto. Ins. Co. v. Lopez,* 156 S.W.3d 550, 555 (Tex.2004). To make a proper analysis, "going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Bernal,* 22 S.W.3d at 435. Although it may not be an abuse of discretion to certify a class that could later fail, a cautious approach to class certification is essential. *Id.* We cannot indulge every presumption in favor of the trial court's ruling on class certification. *See Henry Schein,* 102 S.W.3d at 691. Instead, we review the certification order for "actual, demonstrated compliance," giving deference, where appropriate, to the trial court's resolution of certain limited issues, such as determinations based on the "assessment of the credibility of witnesses." *See id.*

## IV. Analysis

The trial court certified the class based on Rule 42(b)(3), which requires that "questions of law or fact common to the class ... predominate over any questions affecting only individual members" and that class treatment be "superior to other available methods for the fair and efficient adjudication of the controversy." Tex.R. Civ. P. 42(b)(3). Exxon now raises challenges to each of the requirements for class certification, with the exception of numerosity. *See* Tex.R. Civ. P. 42(a), (b)(3).

Exxon complains that "the trial court ... misinterpreted the underlying law...." *See, e.g.,* Appellant's Brief, p. 34. Although the trial court certified a class of plaintiffs with contract claims, many of Exxon's arguments characterize the order as having certified a class of fraud plaintiffs. Exxon emphasizes how difficult it will be for the class representatives to produce class-wide proof that each class member individually and reasonably "relied" on a false representation by Exxon. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex. 2001) (stating that fraud claimant must "show that it actually and justifiably relied on the representation and thereby suffered injury"); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983) (same).

Because Exxon has raised pervasive complaints regarding the trial court's interpretation and application of controlling substantive law, we begin our analysis with an overview of the legal causes of action certified in this case and the controlling law. Although we are not to resolve the merits of the claims in our analysis, the Texas Supreme Court has

2. A trial court abuses its discretion if it (1) acts arbitrarily or unreasonably; (2) does not properly apply the law to the undisputed facts; or (3) rules on factual assertions not supported by the record. *See Wal–Mart Stores v. Lopez,* 93 S.W.3d 548, 553 (Tex.App.-Houston [14th Dist.] 2002, no pet.). An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence. *RSR Corp. v. Hayes,* 673 S.W.2d 928, 930 (Tex.App.-Dallas 1984, writ dism'd w.o.j.) (citing *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex. 1978)).

explained that "issues [such] as commonality, typicality, superiority, and predominance are at least tangentially related to the merits; i.e., one cannot know whether a representative's claim is 'typical' of those of the class without knowing something about the merits." *In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 182 (Tex. 1999). Thus, "substantive law ... must be taken into consideration in determining whether the purported class can meet the certification prerequisites under Rule 42." *Union Pac. Res. Group, Inc. v. Hankins*, 111 S.W.3d 69, 72–73 (Tex.2003).

In the statement of facts provided in Exxon's appellate brief, the company states that the plaintiffs "base their claims on alleged oral promises and Exxon's supposed 'secrecy' in including costs from its rebate programs in its prices." Appellant's Brief, p. 1. The brief continues, "Although they do not formally assert any claims for fraud, all three of their claims depend on allegations of secrecy, misrepresentation and concealment, just as in a typical fraud case." *Id.* at 8. Exxon then asserts that "fraud cases never pass muster under Rule 42." *Id.* at 12. And it suggests that "the complaint about secret wrongdoing confirms that this case is an effort to certify a fraud class by another name...." *Id.* at 14. According to Exxon, "This 'secret catch-back' class is just a fraud class in contract clothing." *Id.* at 24. "The whole notion of a 'secret catch-back' is simply a backdoor effort to create a fraud class that everyone knows would not survive appellate review if it were labeled that way." *Id.* at 28.

Fraud requires proof of actual and justifiable reliance, proof which is necessarily of an "individualized" nature. *Fid. & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 423 (Tex.App.-Corpus Christi 2005, no pet.). As we recently noted in *Pina*, an opinion reversing the certification of a class of fraud plaintiffs, "It is particularly difficult to establish commonality and predominance of reliance in a group setting because ... 'under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision.'" *Id.* (quoting *Grant Thornton, L.L.P. v. Suntrust Bank*, 133 S.W.3d 342, 355 (Tex.App.-Dallas 2004, pet. filed)).

■ Because of the foregoing arguments, which are disputed by the named plaintiffs, we begin with what the Texas Supreme Court has described as the "often ... difficult" determination of what type of action has been certified. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617 (Tex.1986). "We must look to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Id.* at 617–18 (citing *Int'l Printing Pressmen and Ass't Union v. Smith*, 145 Tex. 399, 198 S.W.2d 729 (1946)). "The contractual relationship of the parties may create duties under both contract and tort law." *Id.* at 618 (citing *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947)). "The acts of a party may breach duties in tort or contract alone or simultaneously in both." *Id.* "The nature of the injury most often determines which duty or duties are breached." *Id.* "When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Id.* (citing *Mid Continent Aircraft Corp. v. Curry County Spraying Serv.*, 572 S.W.2d 308, 312 (Tex. 1978); *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977)).

The trial court's order states that it certified the following three claims: (1) breach of the sales agreement; (2) breach of the UCC duty of good faith; and (3) breach of the rebate promises. *See* Class Certification Order, pp. 5, 27. The injuries

alleged by the named plaintiffs [3] and described in the trial court's certification order are economic losses to the class members' contracts with Exxon. *See id.* at 2 ("The plaintiffs allege that instead of giving its dealers the promised economic benefit, Exxon made the dealers as a group pay for the costs of the programs by adding the full costs of the rebate as a secret charge on top of the ordinary 'DTT' wholesale gasoline price."). The claims are therefore contract claims, not tort claims, as Exxon suggests. *See id.* at 10 ("This case is pled as a contract case.").

## A. Numerosity

The first requirement for certification is that "[t]he class is so numerous that joinder of all members is impracticable." Tex.R. Civ. P. 42(a)(1). The trial court's certification order states that "there are hundreds of potential class members." Class Certification Order, p. 3. The order also states that Exxon has conceded that the numerosity requirement is satisfied in this case. *Id.* Exxon has not challenged numerosity on appeal. Accordingly, with no further discussion, we conclude that there was no abuse of discretion in the trial court's certification of the class as it relates to numerosity. *See* Tex.R.App. P. 47.1.

## B. Commonality & Predominance

■ The second requirement for certification is that "[t]here are questions of law, or fact common to the class." Tex.R. Civ. P. 42(a)(2). "The threshold for commonality is not high." *Union Pac. Res. Group, Inc. v. Hankins,* 111 S.W.3d 69, 74 (Tex.2003). "Yet it does require at

least one issue of law or fact that inheres in the complaints of all class members." *Id.* A common issue must also be "applicable to the class as a whole" and "subject to generalized proof." *Id.* (quoting *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir.1982)).

Exxon argues that there is no commonality in this case. It contends that the named plaintiffs and the trial court failed to identify even a single issue that meets Rule 42(a)'s "flexible" commonality requirement. *Bernal,* 22 S.W.3d at 435 (describing the test for commonality as "flexible"). According to Exxon, there is not even one issue in this case that would be "applicable to the class as a whole" and "subject to generalized proof." *See Hankins,* 111 S.W.3d at 74.

Exxon has addressed the plaintiffs' claims as being either fraud claims or claims for breach of an open price term under section 2.305(b) of Texas Business and Commerce Code. *See* Tex. Bus. & Com.Code Ann. § 2.305(b) (Vernon 1994). We have already explained that the plaintiffs have not asserted a cause of action for fraud. In the analysis below, we address the three claims actually certified by the trial court: (1) breach of the sales agreement; (2) breach of the UCC duty of good faith; and (3) breach of the rebate promises. *See* Class Certification Order, pp. 5, 27.

### 1. Commonality

The trial court's certification order identifies the following issues of law and fact common to the class:

(1) Whether Exxon's Sales Agreements with their open-price terms precluded

---

3. The named plaintiffs' second amended class petition makes the following allegation:

Each of the Plaintiffs and Class Members has been damaged by the full amount of the promised rebates of which he, she, or it has

been deprived, consisting of the overcharges represented by the hidden adders to the DTT, through which EXXONMOBIL surreptitiously took back all of the rebates.

Exxon from adding its costs from its rebate programs to its wholesale gasoline DTT price;

(2) Whether the standard-form invoices and rebate documents that Exxon sent or had its managers show to its dealers disclosed that Exxon was adding the cost of the rebate programs to the DTT price;

(3) Whether Exxon did in fact systematically add its average market-area rebate costs to its DTT price in each market area;

(4) Whether Exxon's adding of its rebate costs to its DTT price is an act of dishonesty that takes this case out of the "normal case" under UCC § 2–305;

(5) Whether Exxon's including rebate costs in its DTT price breached its duty of good faith under UCC § 2–305; and

(6) How much Exxon added to its DTT price to recoup its rebate costs.

*Id.* at 3–4.

In challenging the commonality requirement, Exxon argues that the trial court erred in failing to apply the leading case on open-price contracts, *Shell Oil Co. v. HRN,* 144 S.W.3d 429 (Tex.2004). Specifically, Exxon argues:

> The essence of the supreme court decision [in *HRN*] was to adopt a bright-line standard for open price complaints under the UCC. A seller's open price will survive scrutiny under the UCC so long as the price has two characteristics: (1) it is commercially reasonable, i.e., within the range of prices charged by others in the market, and (2) it is not being used to price discriminate among the buyers.

> * * *

> Plaintiffs premise their case on an allegation that Exxon acted in bad faith by incorporating the cost of its rebate programs into the price it charged dealers.

But they did not allege or prove that Exxon charged prices outside the range of its competitors or discriminated against similarly situated dealers. That is not a claim that can survive under Texas law.

Appellant's Brief, pp. 34–35 (internal citations omitted).

We address this argument in two parts. The first part of the argument is that two of the three causes of action certified by the trial court, specifically, those for breach of the sales agreement and breach of the UCC duty of good faith, are actually the same cause of action. That is, they amount to a single cause of action for breach of the open price terms in the sales agreements, which were supposed to be set in "good faith" under the UCC. *See* Tex. Bus. & Com.Code Ann. § 2.305. The second part of the argument is that *HRN* precludes the named plaintiffs' cause of action for breach of the open price term. As explained below, we agree with the first part of Exxon's argument, but we disagree with the second part.

### a. Open Price Terms in Sales Contracts & The Duty of Good Faith under Section 2.305(b)

As the Texas Supreme Court has explained, "Most contracts for the sale of goods specify a price, but some do not because either the parties fail to consider the issue directly or purposefully leave it for later determination." *HRN,* 144 S.W.3d at 432. "When a contract for the sale of goods does not specify a price, section 2.305 of the Uniform Commercial Code supplies default rules for determining whether a contract exists and what the price should be." *Id.* (citing Tex. Bus. & Com.Code Ann. § 2.305). "This section is one of a series of provisions in Article 2 of the Code that fill common 'gaps' in commercial contracts." *Id.*

The section of the Code dealing with open-price-term contracts is codified as section 2.305 of Texas Business and Commerce Code and provides:

(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(1) nothing is said as to price; or

(2) the price is left to be agreed by the parties and they fail to agree; or

(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(c) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(d) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

Tex. Bus. & Com.Code Ann. § 2.305.

In this case, the parties agree that the Code imposes on Exxon the obligation of good faith when fixing its DTT price under the sales agreements, providing that "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." *Id.* § 2.305(b). In discussing issues common to the class, the trial court's order identifies the open-price-term provision in section 2.305(b) as controlling the issue of whether Exxon breached its sales agreements. *See* Class Certification Order, pp. 3–4, 8–9, 11, 27. The order also identifies good faith under section 2.305(b) as the controlling legal standard for whether Exxon breached its duty of good faith under the UCC. *See id.* The named plaintiffs have also treated the two causes of action as being the same. Brief of Appellees, p. 1 ("All Texas dealers had Sales Agreements with open DTT prices, all subject to the UCC duty of good faith."). On this record, we agree that the two causes of action are the same for purposes of class certification. We will therefore refer to the claims together as simply the "section 2.305(b)" claims.

#### b. *HRN*

■ The second part of Exxon's argument is that *HRN* precludes a section 2.305(b) claim based on the facts alleged by the named plaintiffs. In *HRN*, the Texas Supreme Court warned that "[p]remising a breach of contract claim solely on assumed subjective motives injects uncertainty into the law of contracts and undermines one of the UCC's primary goals-to 'promote certainty and predictability in commercial transactions.'" *HRN*, 144 S.W.3d at 435 (quoting *Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 92 (Tex.2000)). The effect of *HRN* was "to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards." *Id.*

*HRN* did not eliminate section 2.305(b) claims based on "allegation[s] of bad faith [that] result in a commercial injury distinct from the price increase itself." *Id.* at 436. It cautioned, "Allegations of dishonesty under ... section [2.305] must also have some basis in objective fact which at a minimum requires some connection to the

commercial realities of the case." *Id.* at 435–36. In reaching its holding, the Texas Supreme Court specifically relied on Official Comment 3 to section 2.305, which explains:

> 3. Subsection [b], dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2–103). But in *the normal case* a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

*See id.* (quoting Tex. Bus. & Com.Code Ann. § 2.305 cmt. 3) (emphasis added)).

The fourth and fifth "common issues" identified in the trial court's order are "whether Exxon's adding of its rebate costs to its DTT price is an act of dishonesty that takes this case out of the 'normal case' under UCC § 2–305" and "whether Exxon's including rebate costs in its DTT price breached its duty of good faith under UCC § 2–305." Class Certification Order, pp. 3–4. In our view, these issues are appropriate for the section 2.305(b) claims pled against Exxon. They are also consistent with *HRN*.

Under *HRN*, the controlling question for the section 2.305(b) claims is whether the "allegations of dishonesty" in this case have "some objective basis in fact," meaning "a commercial injury distinct from the price increase itself." *HRN*, 144 S.W.3d at 435–36. If so, this would not be the "normal case" described in Comment 3, where the seller's " 'given price,' 'price in effect,' 'market price,' or the like satisfies

the good faith requirement." Tex. Bus. & Com.Code Ann. § 2.305 cmt. 3. Comment 3 "rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish." *Id.*

Unlike *HRN*, this case involves more than an open price term that was allegedly determined based on a "subjectively improper motive." *See HRN*, 144 S.W.3d at 432. In this case, there were contemporaneously performed standardized sales contracts and various rebate-incentive programs that were implemented and ceased at specific points in time, involving specific promises of economic remuneration for keeping stores open specified hours and selling specified volumes of gasoline. The legal reality of this case is that the plaintiffs have sued for more than breach of the open-price term under the standardized sales agreements. They have also sued for breach of the promise to provide economic benefits under the rebate programs. Thus, we share the trial court's conclusion that a "common issue" will be whether Comment 3 and *HRN* preclude or allow recovery based on the class's allegations of dishonesty and a commercially distinct injury based on the economic loss of the rebates. *See* Class Certification Order, p. 11 ("Whether Exxon's alleged conduct in secretly catching-back the rebates in the price of the gasoline it sold to the class members was in bad faith will involve a determination under § 2.305 of whether the circumstances here constitute a 'normal' case ... [under] Comment 3.").

#### c. Common Proof & Common Answers

Exxon has also attempted to defeat certification on the basis that there can be no "common proof" or "common answers," as required by the Texas Supreme Court in *Hankins*. *See Hankins*, 111 S.W.3d at 75.

Exxon frames the controlling legal questions in this case in terms of each individual dealer's subjective knowledge and intent. It does this in two ways. First, it suggests that a dealer's lack of knowledge of the catch-backs is a prerequisite to recovery on their claims, thus defeating the possibility of "common proof." *See* Appellant's Brief, p. 27 (stating "their burden as a class representative is to prove that no dealer, not a single dealer could know, understand, or believe"). And second, Exxon suggests that a dealer's knowledge of the catch-backs is a defense for Exxon, thus necessitating an opportunity for Exxon to prove that different dealers knew different things, and again defeating class treatment of the claims because there would be no "common proof" or "common answers." *See id.* at 29 (complaining that "[w]hat the trial court did not do was to confront the evidence of differences among different dealers as to their understanding of the rebate programs.").

■ We first address Exxon's argument that varying levels of individual dealer knowledge defeat "common proof" for the class claims against Exxon. As the trial court noted, this is a contract case. *See* Class Certification Order, p. 10. To recover for breach of contract, a claimant must prove the following: (1) there is a valid, enforceable contract; (2) the claimant performed as required under the contract; (3) the defendant has breached the contract; and (4) the defendant's breach caused the claimant injury. *Valero Mktg. & Supply Co. v. Kalama, Int'l,* 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

There is no dispute that valid, enforceable sales and rebate agreements exist between Exxon and the putative class members. *See* Class Certification Order, pp. 10, 12. There is also no dispute that the material terms of the contracts are the same or similar throughout the class. *See id.* The trial court's order states that the terms of the sales agreements "are uniform in the most material respect" and that the "rebate programs had uniform terms." *Id.* at 10 (sales agreement), 12 (rebate programs).

The parties' dispute over liability concerns two central questions common to the class: (1) whether Exxon actually recouped the average per-gallon cost of the rebate programs by adding it to the DTT price; and (2) whether such conduct amounted to a breach of contract either under the sales agreements and section 2.305(b) or under the rebate programs.

"Exxon denies that it ever 'recouped' the 'full cost' of the rebate programs in its DTT price." Appellant's Brief, p. 31. According to Exxon, "The cost of the rebate programs did not drive Exxon's pricing decisions. Nor did Exxon use a rigid formula aimed at 'recouping' any rebate costs in the DTT price charged dealers. Exxon simply considered the cost of the rebates as one factor in its ongoing review of the competitive market." *Id.* at 4, 31 n. 4.

Thus, a contested liability issue common to the class will be whether Exxon actually recouped the average per-gallon cost of the rebate programs by adding it to the DTT price, as alleged by the named plaintiffs. The trial court's order states that the named plaintiffs will seek to prove this contested liability question using class-wide proof of Exxon's standardized practice of systematically recouping the costs of the rebate programs and thus the economic value conferred to the dealers through "credits" on their sales invoices. *See* Class Certification Order, pp. 10–20. The certification order identifies different types of class-wide evidence offered by the named plaintiffs to prove these allegations. *See id.* (discussing various types of class-wide evidence). The order also notes Exx-

on's denial that it has "recouped" the "full cost" of the rebate programs in its DTT price. *See id.* at 16 ("Earlier in this case, it did not seem that Exxon would deny that it on average recouped the rebate cost in its DTT price.... Some of Exxon's evidence suggests that it may now dispute whether it actually recouped full rebate costs 'on average' in its DTT price."); Appellant's Brief, p. 31 (denying that Exxon ever "recouped" the "full cost" of the rebate programs in its DTT price).

Whether Exxon did or did not recoup the full cost of the rebate programs is a hotly-contested fact issue in the case. Given Exxon's position that it did not fully recoup the rebates, it is unclear how or why resolution of this dispute depends on individual dealer knowledge or understanding, as Exxon suggests.[4] The trial court's order notes that Exxon will most likely use class-wide evidence to prove that it never "recouped" the "full cost" of the rebate programs in its DTT price. *See* Class Certification Order, p. 16. Thus, there will be common proof for both the class members and for Exxon on one of the most hotly-contested fact issues at trial.

Another hotly-contested fact issue is whether Exxon actually informed the dealers about the relationship between DTT prices and the rebate programs. Exxon maintains that it did, but claims that it did so in different ways, with different results. *See* Appellant's Brief, p. 30 ("Exxon presented extensive evidence that its dealers knew about the relationship between its rebate programs and DTT prices in varying ways, and likely to varying degrees."). The trial court ruled that common proof

could nevertheless be used to prove what Exxon did and did not disclose, noting that even Exxon had offered class-wide proof of its disclosures. *See* Class Certification Order, p. 14 ("Exxon says for purposes of certification that what its dealers knew varies individually, but at the same time it argues that it sent a uniform message to the dealers and points to classwide evidence on this issue. Exxon claims that it told all of its dealers that it was 'offsetting' its rebate costs by increasing its DTT prices.").

The central issue in dispute is not whether Exxon told different dealers different things. The central issue is whether Exxon recouped the "full value" of the rebates. Exxon denies doing so. The named plaintiffs allege that it did. As a practical matter, if the named plaintiffs succeed at trial in showing that Exxon fully recouped the value of the rebates, they will have also established Exxon's dishonesty in the transactions and throughout this litigation in maintaining (as it does in this appeal) that it never "recouped" the "full cost" of the rebate programs in its DTT price.

Either Exxon is telling the truth about not fully-recouping the rebates, or it is not. The answer can be determined on a class-wide, "yes" or "no" basis, and the answer will be the same for all members of the class based on the class-wide evidence identified in the trial court's order. *See* Class Certification Order, pp. 10–20. If the named plaintiffs prevail in establishing that Exxon's position is incorrect, they will have also established Exxon's dishonesty on a class-wide basis. We think this is pretty close to an ideal situation, where

---

4. Exxon has not argued that the terms of the contracts depend on an individual dealer's knowledge or understanding of the catch-back practice. This is consistent with long-standing precedent from the Texas Supreme Court holding that a claimant's rights to recover under a contract are controlled by the parties' objective, not subjective, intent. *See, e.g., City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968).

class treatment will involve class-wide evidence that has at least the demonstrated potential to uniformly resolve hundreds of disputes about the same alleged conduct by Exxon.

Whether Exxon's alleged misconduct (if proven) amounts to a breach of good faith under section 2.305(b) or a breach of the rebate programs are issues that go to the merits of the case. As such, they are properly reserved in the first instance to the jurisdiction of the trial court. *See Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404 (Tex.2000) ("Deciding the merits of the suit in order to determine the scope of the class or its maintainability as a class action is not appropriate."). In this analysis, we address only whether common proof can be used on the common issues regarding Exxon's conduct for purposes of certification. We agree with the trial court's reasoning when it declared that "the controlling issues can be proven with common evidence" because "the focus of the litigation is going to be on Exxon's conduct." *See* Class Certification Order, p. 9. For these reasons, we reject Exxon's argument that varying levels of individual dealer knowledge will defeat common proof for the class.

As noted above, Exxon has also raised individual dealer knowledge of the catchback as a defense to the claims of the named plaintiffs, arguing that there will be "no common proof" or "common answers" to the class claims. As a part of defensive issues (rather than as part of the named plaintiffs' case-in-chief), we believe that individual dealer knowledge is properly considered in reviewing the trial court's predominance ruling, rather than its ruling on commonality. *See Hankins,* 111 S.W.3d at 74 (stating that commonality requires only *"one issue* of law or fact that inheres in the complaints of all class members") (emphasis added). Accordingly, we overrule

Exxon's challenge to commonality and proceed to address its challenge to predominance.

### 2. Predominance

█ The certification order identifies the following "controlling substantive issues" that will predominate over individual issues:

(1) Whether Exxon and the class members entered into contracts with materially, similar open-price terms;

(2) Whether Exxon created uniform rebate programs that promised dealers that they would earn rebates if they sold certain amounts of gasoline;

(3) Whether Exxon used the same methodology to compute its gasoline prices to dealers in Texas;

(4) Whether Exxon secretly added a rebate catch-back to the price of the gasoline it sold to the class members;

(5) Whether Exxon's secret rebate catch-back was a breach of Exxon's duty to price its gasoline to the dealers in good faith, and a breach of the contracts with the class members; and

(6) The aggregate amount of the rebate catch-back.

*See* Class Certification Order, p. 9.

"The predominance requirement is one of the most stringent prerequisites to class certification." *Bernal,* 22 S.W.3d at 433. "In effect, the exacting standards of the predominance inquiry act as a check on the flexible commonality test under Rule 42(a)(2)." *Id.* at 435. "The predominance requirement is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses." *Id.* at 434. To aid a court in determining if (b)(3) certifi-

cation is appropriate, the rule establishes a list of non-exhaustive factors to consider:

 (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

 (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

 (C) the desirability or undesirability of concentrating the litigation in the particular forum; and

 (D) the difficulties likely to be encountered in the management of a class action.

Tex.R. Civ. P. 42(b)(3).

■■■■■ "Courts determine if common issues predominate by identifying the substantive issues of the case that will control the outcome of the litigation, assessing which issues will predominate, and determining if the predominating issues are, in fact, those common to the class." *Bernal*, 22 S.W.3d at 434 (citing *Reserve Life Ins. Co. v. Kirkland*, 917 S.W.2d 836, 839 (Tex. App.-Houston [14th Dist.] 1996, no writ); *Amoco Prod. Co. v. Hardy*, 628 S.W.2d 813, 816 (Tex.App.-Corpus Christi 1981, writ dism'd)). "The test for predominance is not whether common issues outnumber uncommon issues but, as one court stated, 'whether common or individual issues will be the object of most of the efforts of the litigants and the court.'" *Id.* (quoting *Central Power & Light Co. v. City of San Juan*, 962 S.W.2d 602, 610 (Tex.App.-Corpus Christi 1998, writ dism'd w.o.j.)). "If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate." *Id.* Ideally, "a judgment in favor of the class members should decisively settle the entire controversy, and all that should remain is for other members of the class to file proof of their claim." *Id.* (quoting *Life Ins. Co. of the Southwest v. Brister*, 722 S.W.2d 764, 772 (Tex.App.-Fort Worth 1986, no writ)).

The central liability questions inherent in the complaints of all class members are whether Exxon breached its good faith obligation under its sales contracts and whether it breached its rebate promises by systematically recouping the economic value of the rebates through DTT pricing. Exxon contends that individual issues will predominate over these common questions, citing as support several issues that "must be resolved on a dealer-by-dealer basis." Appellant's Brief, p. 32. Chief among these issues "are differences among dealers as to their understanding of the rebate programs." *Id.* at 29. Exxon also cites defenses that must be decided individually, such as release, notice, and statute of limitations. *Id.* at 29–33. For the reasons that follow, we overrule Exxon's issues.

### a. Voluntary Payment Rule and Individual Dealer Knowledge

■■■■ Exxon relies on the voluntary payment rule to create an issue regarding individual dealer knowledge, an issue which has already featured prominently in the arguments addressed in this opinion. The trial court rejected the voluntary payment rule as a defense, stating that it does not apply to claims for breach of contract. We agree.

Voluntary payment is a common law rule that has been articulated as follows: " 'Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" *BMG Direct*, 178 S.W.3d at 768 (quoting *Pennell v. United Ins. Co.*, 150 Tex. 541, 243 S.W.2d 572, 576

(1951)). The rule is a defense to claims asserting unjust enrichment, not to claims for breach of contract. *Id.* at 775. We therefore conclude that, in this action for breach of contract, individual dealer knowledge of the catch-backs is not a valid defense and cannot be characterized on that basis as a "substantive issue of the case" that will be "the object of most of the efforts of the litigants and the court." *Bernal,* 22 S.W.3d at 434.

### b. Balancing Issues Common to the Class with Individual Issues on Defenses of Release, Notice, and Statute of Limitations

Exxon's remaining defenses are release, notice, and statute of limitations. Again, Exxon argues that these defenses raise questions that "cannot be answered the same way for all dealers." Appellant's Brief, p. 33. It contends that the trial court erred in certifying a class of plaintiffs to which these defenses will be asserted because the defenses will depend on individual dealer knowledge and on facts of an individualized nature, thus defeating the possibility of common proof. *Id.* at 29–33, 40–45. According to Exxon, predominance is impossible because Exxon needs "to cross-examine each class member" or be "stripped of any defenses." *Id.* at 45. We disagree.

■■■ Predominance is not a question of pure law on which we give no deference to the trial court. The trial court's determination of predominance is reviewed for abuse of discretion. *Henry Schein,* 102 S.W.3d at 691 (citing *Bernal,* 22 S.W.3d at 439). The standard of review is not "de novo." *See id.* This is important because it is not necessarily an abuse of discretion to certify a class that might ultimately fail. *See Bernal,* 22 S.W.3d at 435 ("Although it may not be an abuse of discretion to certify a class that could later fail, a cautious

approach to class certification is essential.").

Exxon complains that the trial court abused its discretion by denying Exxon its due process rights to assert defenses against individual class members. Exxon airs most of its complaints about the trial court's ruling on predominance with the tacit understanding (not shared by this Court) that individual dealer knowledge of the rebate catch-backs will be paramount in this case. We have reviewed and rejected this contention in overruling Exxon's challenge to commonality.

Our review of predominance is different, however, because we address Exxon's defenses, including notice and limitations. The trial court discussed these defenses in its predominance analysis. *See* Class Certification Order, pp. 32–33. The court noted that the named plaintiffs have pled fraudulent concealment to avoid the defenses of notice and limitations. *Id.* According to the certification order, none of the class members gave the pre-suit notice required under the UCC. *Id.* at 33. The order also indicates the possibility that the class claims will be assailable on limitations grounds. *See id.* In ruling that the predominance requirement was satisfied, the trial court stated that the class allegations of fraudulent concealment will determine whether the section 2.305(b) claims are defeated by the pre-suit notice requirement under the UCC or by the statute of limitations. *Id.* We agree.

■■■ "When a defendant has fraudulently concealed the facts forming the basis of the plaintiff's claim, limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the injury." *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 750 (Tex.1999). The "essential ingredients" of fraudulent concealment include, first, actual knowl-

edge of the fact that a wrong has occurred, and, second, a fixed purpose to conceal the wrong. *Earle v. Ratliff,* 998 S.W.2d 882, 888 (Tex.1999).

Allegations of these "essential ingredients" are present in this case. They inhere in the injuries alleged by the named plaintiffs. Exxon is alleged to have systematically and secretly recouped the economic value of the rebates. The class-wide allegations of secret injuries are relevant not only to the class claims of bad faith under section 2.305(b), but also to the allegations of fraudulent concealment that will determine Exxon's notice and limitations defenses. *See* Appellant's Brief, p. 45 ("[D]efenses that depend on each class member's understanding of the relationship between the rebate programs and the pricing ... include the statute of limitations and the notice defenses mentioned earlier.").

Again, we disagree with Exxon's specific complaint about the significance of individual dealer knowledge. We do not agree that it will be necessary for Exxon "to cross-examine each class member," as it emphatically contends. *See id.* One of the most hotly-disputed questions in this case is whether Exxon recouped the "full cost" of the rebate programs without telling the class members. Even in this appeal, Exxon maintains that it did not recoup the "full cost" of the programs. Exxon's position amounts to a class-wide assertion that presents the same fundamental issue for each class member: specifically, "whether Exxon secretly added a rebate catch-back to the price of the gasoline it sold to the class members." *See* Class Certification Order, p. 9 (identifying the foregoing as the fourth "controlling substantive issue in this case").

Given Exxon's position before and during this litigation, "secretly added a rebate catch-back to the price" would mean the "full" (rather than partial) cost of the rebates. Exxon admits to partially recouping the rebates and even that it told dealers about a partial catch-back practice. But nowhere in the pages of its appellate brief does Exxon admit to recouping the "full cost" of the rebates. This is perhaps the most critical fact in dispute. If Exxon fully recouped the rebates, as alleged by the named plaintiffs, it necessarily did so without telling anyone—hence the allegations that Exxon did so "secretly" (and the company's firm position that no "full cost" recovery occurred).[5]

5. The appellate brief filed by the named plaintiffs makes the following argument:

[W]hether Exxon really told its dealers about the rebate add-ons is a common question that should be tried on a classwide basis.... Exxon is essentially saying that it believes a dealer's knowledge gives Exxon an affirmative defense against that dealer. Yet the issue is Exxon's own honesty.... When Exxon recouped its rebate costs by adding the average per-gallon cost onto its DTT prices, all class members were overcharged.... The representatives claim that they are entitled to recover the per-gallon DTT add-ons that Exxon imposed, in violation of its UCC obligations. Class members are in the same situation, with the same claim based on the same misconduct....

[T]his case turns on Exxon's contractual promises, not individual dealer knowledge ... Dealer knowledge is not irrelevant, of course, in the following sense: If the facts supported it (they don't), Exxon might argue that it communicated the DTT add-ons to dealers as a group, so as to refute any allegation of corporate bad faith. In this sense, the knowledge of dealers as a group might be relevant to an argument that Exxon's uniform pricing practices were honest rather than dishonest. However, that is not what Exxon is saying. Rather, Exxon is saying that each individual dealer's state of knowledge is relevant to Exxon's own honesty or dishonesty. There is zero law to support that approach—which is why Exxon would rather talk about fraud cases, where individual reliance can be an issue.

Without passing on the merits of any particular claim or defense, we share the trial court's conclusion that "the controlling issues [in this case] can be proven with common evidence" because "the focus of the litigation is going to be on Exxon's conduct." *See id.* We believe that Exxon's conduct "will be the object of most of the efforts of the litigants and the court." *Bernal,* 22 S.W.3d at 434; *Kirkland,* 917 S.W.2d at 839. If Exxon recouped the full value of the rebates, it will be a short inquiry for the finder of fact (based on the same evidence) to next conclude that Exxon has also misrepresented the truth about the catch-backs since the inception of its rebate programs. Even in light of Exxon's defenses of notice and limitations, it is clear that the efforts of the litigants will be directed to the single issue of whether Exxon recouped the "full value" of the rebates through its catch-backs.

The only defense that we have not yet discussed is release. We have left release for the end of our analysis because it has been asserted against only one of the named plaintiffs (Plaintiff Gill). The trial court's order discusses the release signed by Plaintiff Gill. *See* Class Certification Order, pp. 22–23. The court found "it likely that some substantial portion of the class may well have signed identical releases." *Id.* at 5. The order states that, despite discovery requests, Exxon has produced no evidence of any releases applicable to other class members that would be different in any material respect from the release signed by Plaintiff Gill. *Id.* at 22. The order demonstrates the trial court's consideration of the defense and also shows the court's basis for following feder-al precedent allowing class treatment of similar claims:

> Exxon must know how many other dealers also signed releases, but it has not presented any information showing how many other dealers did sign releases or any different terms in such releases. The Court further takes notice that in [other] litigation against Exxon that raised many of the same substantive issues as this case, the Allapattah litigation, in which there were roughly 10,000 class members, over 5,000 had signed releases, and the Court found that all but a handful were releases with the same material terms. *Allapattah Services, Inc. v. Exxon,* 188 F.R.D. 667, 668–81 & n. 24 (S.D.Fla.1999).

*Id.* at 5–6.

■■■ The existence of affirmative defenses against individual class members does not necessarily prevent class certification. *See Microsoft Corp. v. Manning,* 914 S.W.2d 602, 613 (Tex.App.-Texarkana 1995, writ dism'd) (including affirmative defenses of contributory negligence, superseding cause, and failure to comply with warranty); *Dresser Indus., Inc. v. Snell,* 847 S.W.2d 367, 373 (Tex.App.-El Paso 1993, no writ) (including affirmative defenses of limitations, lack of misrepresentation, and ratification). There is no question that the trial court considered guiding rules and principles in making its determination of predominance in light of the defense of release. The court specifically relied on federal precedent demonstrating that suits such as this are manageable as a class action.[6]

Brief of Appellees, pp. 23, 25–26, 29, 31–32.

6. Some of the arguments Exxon makes in this appeal seem similar to the arguments Exxon made on appeal in *Allapattah. See Allapattah Servs. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Circ.2003). The Eleventh Circuit Court of Appeals rejected Exxon's arguments in that case, and the United States Supreme Court denied certiorari. As the Eleventh Circuit explained:

> Exxon's primary argument in support of its contention that the class should not have

In our view, this class comes close to the ideal class described in *Bernal*, where the Texas Supreme Court explained that "a judgment in favor of the class members should decisively settle the entire controversy." *Bernal*, 22 S.W.3d at 434. If the named plaintiffs prove that Exxon fully recouped the economic value of the rebates, there will remain nothing for other members of the class to file but proof of their claims. *See id.* "The fact that damages must be computed separately for each class member does not necessarily mean in itself that individual issues predominate over common issues of law and fact." *Citgo Ref. & Mktg. v. Garza*, 187 S.W.3d 45, 71 (Tex.App.-Corpus Christi 2006, pet. filed) (citing *Sun Coast Resources, Ltd. v. Cooper*, 967 S.W.2d 525, 534 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd)).

As noted above, there is at least one individual question in the case (aside from damages) that pertains to Plaintiff Gill's release. Although the trial court apparently anticipated that more class members will surface and have this defense asserted against them, it nevertheless ruled that common issues will predominate over individual issues. Its certification order shows a reasonable and informed thought process for concluding that the presentation and resolution of individual issues will not be "an overwhelming or unmanageable task for a single jury." *Bernal*, 22 S.W.3d at 434. The order demonstrates actual compliance with Rule 42, including meaningful contemplation of all the defensive issues asserted by Exxon.

It would be improper to reverse the trial court's ruling simply because of an inchoate possibility that the claims of some class members may yield different answers in light of the release defense, especially because of the trial court's reference to unanswered discovery in its analysis of this problem. *See* Class Certification Order, p. 22. As the Third Court of Appeals recently explained:

> We accord trial courts an abuse of discretion standard because the class certification decision occurs early in the litigation process, before the parties have had the opportunity to fully develop the case and such issues as trial plan will have only been determined as a preliminary matter. The trial court must approach the certification decision cautiously in order to balance the requirements of rule 42 and the difficulties presented by the case's infancy. Thus, the trial court's certification order must explain adequately how each class action claim "could be tried manageably in a class action," in order to

---

been certified is that there were individual issues inherent in each dealer's breach of contract claim and its own affirmative defenses. We find that Exxon's argument that each breach of contract claim raised an individual issue is without merit. Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a question common to the class and the issue of liability was appropriately determined on a class-wide basis.

Thus, the real question for the district court was whether the common issue of liability predominated over the individual issues raised by Exxon's affirmative defenses, which pertained primarily to the issue of damages rather than liability. In similar situations, numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate. We agree. Based upon the facts of this case, we believe that Exxon's liability to the class for breach of the dealer agreements predominated over the individual issues relating to damages.

*Id.* at 1261 (internal citations omitted).

show "actual, demonstrated compliance with Rule 42."

*Farmers Ins. Exch. v. Leonard,* 125 S.W.3d 55, 60, 69 (Tex. App.-Austin 2003, pet. denied). For these reasons, we overrule Exxon's challenges to the trial court's certification ruling as it relates to predominance.

## C. Typicality

 The third requirement for class certification is that "[t]he claims or defenses of the representative parties are typical of the claims or defenses of the class." Tex.R. Civ. P. 42(a)(3). In order to satisfy the typicality requirement, the class representative must possess the same interests as the class. *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). To be typical, the claims of class representatives need not be identical, but they must arise from the same event or course of conduct and must also be based on the same legal theories. *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 653 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.).

Exxon argues that typicality is not met in this case for two reasons. "First, all three named plaintiffs are not typical of the many Texas dealers who knew and understood that Exxon factored the cost of its rebates into the prices it charged." Appellant's Brief, p. 23. "Second, Plaintiff Gill signed a release." *Id.* According to Exxon, "The release defense makes typicality impossible, because 'even an arguable defense peculiar to a named plaintiff' destroys typicality." *Id.* at 23–24.

Yet again, we are drawn back to the issue of individual dealer knowledge. Here, if nowhere else, it is worth noting that the trial court's order specifically addressed Exxon's evidence of differences in dealer knowledge. *See* Class Certification Order, pp. 22–23. The order states that none of Exxon's evidence pertained to any of the class members in this case. *See id.* at 23. In fact, the court described the affiants as having "no listed connection to this Texas class." *Id.* Thus, Exxon's "class conflict" is only hypothetical at this point in the litigation.

 Exxon has made arguments for why the hypothetical nature of the "class conflict" should not matter legally on appeal for purposes of defeating certification, but the trial court's point is still well-taken. An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence. *RSR Corp. v. Hayes,* 673 S.W.2d 928, 930 (Tex.App.-Dallas 1984, writ dism'd w.o.j.) (citing *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978)). Given the language used in the trial court's order, it might be somewhat of a stretch to say that there is "conflicting evidence" in this case regarding the differences in class member knowledge—the trial court having discounted most of the evidence because it came from non-class members. See Class Certification Order, pp. 23–24. Even if there were some evidence in the certification record to support Exxon's position, something rising to the level of "conflicting evidence," there would still be no basis for concluding that the trial court abused its discretion. *See RSR Corp.,* 673 S.W.2d at 930 (citing *Davis,* 571 S.W.2d at 862).

Exxon also attacks the "typicality" of Plaintiff Gill because he signed the release discussed above. Again, the trial court's order explains why that fact does not preclude certification, and again, Exxon argues that the trial court got it wrong. *See* Class Certification Order, pp. 4–6; Appellant's Brief, pp. 22–24. On this point, we take note of a 2002 opinion by the Sixth Court of Appeals that discussed individual defenses such as release and typicality in reviewing class certification:

The presence of an "arguable defense unique to the named plaintiff" properly negates typicality only when "it is predictable" that such defense will become a "major focus of the litigation," *Koos v. First Nat'l Bank*, 496 F.2d 1162, 1164 (7th Cir.1974), such that the named plaintiff "will become distracted by the presence of a possible defense ... that the representation of the rest of the class will suffer," *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir.1980).

*Bailey v. Kemper Cas. Ins. Co.*, 83 S.W.3d 840, 854 (Tex.App.-Texarkana 2002, pet. denied).

In light of these guiding rules and principles, we have no basis for concluding that the trial court abused its discretion in determining that the claims of Plaintiff Gill are typical of the claims of the class. Exxon's challenge to typicality is overruled.

### D. Adequacy

■ The fourth requirement for class certification is that "[t]he representative parties will fairly and adequately protect the interests of the class." Tex.R. Civ. P. 42(a)(4). Adequacy of representation is a question of fact and must be determined based on the individual circumstances of each case. *Farmers Ins.*, 125 S.W.3d at 66; *Dresser Industries*, 847 S.W.2d at 373. Adequacy of representation is addressed to the sound discretion of the court. *Farmers Ins.*, 125 S.W.3d at 66; *Dresser Industries*, 847 S.W.2d at 373.

■ Adequate representation requires an absence of antagonism between the class representatives and the class members and an assurance the representative parties will vigorously prosecute the class claims and defenses. *Hi–Lo Auto Supply, L.P. v. Beresky*, 986 S.W.2d 382, 388 (Tex.App.-Beaumont 1999, no pet.) (citing *E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565, 568 (Tex.App.-Austin 1998, no pet.)). Only a conflict that goes to the very subject matter of the litigation will defeat a finding of adequacy. *Farmers Ins.*, 125 S.W.3d at 66; *Nissan Motor Co. v. Fry*, 27 S.W.3d 573, 583 (Tex.App.-Corpus Christi 2000, pet. denied). Speculative allegations concerning potential conflicts are insufficient to show that the trial court abused its discretion in finding the representatives to be adequate. *Farmers Ins.*, 125 S.W.3d at 66.

Exxon contends that the certification order must be reversed because (1) "the trial court ignored conflicts that make certification improper" and (2) "the trial court's analysis of adequacy disobeys *Bernal* by shifting the burden to Exxon." Appellant's Brief, pp. 16–20.

Once again, Exxon raises individual dealer knowledge—this time for purposes of challenging adequacy. Here, Exxon contends, that "[b]y building their case on claims of a 'secret' charge and fraudulent concealment, the plaintiffs made an issue of dealer knowledge, thereby driving a wedge between dealers who knew about the charge and dealers who did not. This conflict makes class treatment improper." *Id.* at 16. Exxon's brief continues, "The only way for the plaintiffs to try their class action claim—about a supposedly 'secret' charge—will be to attack the credibility of their fellow dealers. With many dealers insisting that there was no secret, the three named plaintiffs must insist on a contrary view. The plaintiffs must attack the testimony of any fellow dealers who would say there was no secret." *Id.* at 18.

Here, we find it appropriate to reiterate that the "class conflict" is still only hypothetical. The trial court discussed the evidence in its order, and there is nothing that we can add to that discussion as an appellate court, except to note that ade-

quacy of representation is a question of fact and must be determined based on the individual circumstances of each case. *See Farmers*, 125 S.W.3d at 66; *Dresser Industries*, 847 S.W.2d at 373.

As for Exxon's complaint regarding a "reversal" of the burden of proof, the ultimate question remains whether the trial court abused its discretion in finding that the named plaintiffs will provide adequate representation for the class members in this action. *Henry Schein*, 102 S.W.3d at 691 (citing *Bernal*, 22 S.W.3d at 439). Even Exxon seems to concede that there is no actual evidence of class-member conflict for this Court to review or discuss. *See* Appellant's Brief, p. 16 (stating that named plaintiffs were "[u]nable to make Exxon's evidence of conflicts go away" but citing to no actual evidence in the record of any conflict between class members). The trial court's order provides a detailed analysis of the adequacy requirement under Rule 42(a)(4), including reasons for overruling the specific challenges made by Exxon. *See* Class Certification Order, pp. 6–8. This Court is not in a position to substitute its judgment for that of the trial court. We review the certification order for abuse of discretion. *Henry Schein*, 102 S.W.3d at 691 (citing *Bernal*, 22 S.W.3d at 439). We believe that it is apparent on the face of the order that the trial court did not take a "certify now and worry later" approach to adequacy, as Exxon contends in its brief. Appellant's Brief, p. 22. To the contrary, before certifying the class, the trial court specifically addressed and rejected Exxon's speculative claims concerning potential conflicts, finding that they would not frustrate the named plaintiffs' abilities to adequately represent the class. *See* Class Certification Order, pp. 6–8. Exxon has shown no abuse of discretion on this record.

## E. Superiority

We have discussed the predominance requirement in connection with our analysis of commonality. In doing so, we did not address the requirement under Rule 42(b)(3) that class treatment be "superior to other available methods for the fair and efficient adjudication of the controversy." Tex.R. Civ. P. 42(b)(3). We do so now.

A class action is superior to other methods of adjudication where any difficulties that might arise in the management of the class are outweighed by the benefits of class-wide resolution of common issues. *Philadelphia Am. Life Ins. v. Turner*, 131 S.W.3d 576, 595 (Tex.App.-Fort Worth 2004, no pet.) (citing *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 654 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.)). Superior means more than equivalent; the class action must be more fair and efficient than other methods. *Schein*, 102 S.W.3d at 700.

In its appellate brief, Exxon states, "Our supreme court has not written much on superiority, so this case would make a good vehicle for this Court to develop law on that issue." Appellant's Brief, p. 38. The brief continues, "Given the size of the potential recovery, the American legal market can be counted on to supply entrepreneurial counsel to prosecute the claims.... Because the plaintiffs are knowledgeable people who seek large damage awards, proceeding as individuals would be at least as efficient as proceeding as a class." *Id.* at 39. In addition, "the ability to recover attorney's fees render[s] plaintiffs' individual claims economically feasible." *Id.* at 40.

Although the size of the potential recovery and the ability to recover attorneys' fees are relevant considerations, we still operate under an "abuse of discretion" standard, meaning that at a minimum, we

must acknowledge and discuss the trial court's reasons for finding class treatment to be superior. *See Henry Schein,* 102 S.W.3d at 691 (citing *Bernal,* 22 S.W.3d at 439). Exxon's arguments would have us supplant our view on the issue of superiority for that of the trial court without even addressing the basis or substance of the trial court's ruling. Equally disquieting is the disingenuous suggestion made in Exxon's brief that Exxon would (for some unstated reason) welcome the participation of "entrepreneurial counsel" in a multitude of individual cases against Exxon based on the same common issues identified by the trial court's certification order.

The order reads in relevant part:

The nature of these claims and the cost and complexity of the litigation makes it desirable to concentrate this case in one forum, as opposed to individual cases. It would be inefficient, costly and a waste of judicial resources, as well as an invitation for conflicting results, to require each class member to litigate the common issues presented in this cause in multiple individual cases. Not only would responding to Exxon's defensive pleadings and arguments likely require an individual litigant to incur legal fees and costs far in excess of that dealer's damages, but in addition, it would be extraordinarily wasteful for the judicial system if similar lawsuits had to be replicated on an individual basis.

Class Certification Order, p. 26. We find no abuse of discretion in this determination.

### F. Trial Plan & Due Process

In a final pair of issues that are largely cumulative of the issues above regarding the specific requirements for class certification under Rule 42, Exxon asks this Court to de-certify the class because the trial plan "does not explain how Exxon can be given a full and fair opportunity to present its defenses at trial" and because "the trial plan deprives Exxon of its constitutional right to due process" "by requiring Exxon to defend against a fictive composite plaintiff." Appellant's Brief, pp. 40, 43. Although these arguments are distinct from those discussed above, they are nevertheless premised on the same two analogies, one to fraud and the other to *HRN*, already considered and rejected by this Court.

The issues are also based on the same hypothetical conflict between class members that we have already discussed and rejected. Perhaps most fundamentally, the issues are based on Exxon's contention that there can be no "common proof" on class issues because Exxon will produce evidence at trial (there is none yet) to show that different class members knew different things about DTT pricing and the rebate programs. Exxon has not explained how this knowledge would be relevant at trial. Exxon denies the allegations of the named plaintiffs that it fully recouped the cost of the rebate programs. If the named plaintiffs succeed in establishing that Exxon did fully recoup the costs, it is unclear how individual dealer knowledge of a *partial* recoup practice would change the result of the trial. It is equally unclear why the trial plan should be held deficient for not discussing evidence that may not be relevant or admissible at trial. For these reasons, we overrule the final two issues presented in Exxon's brief.

### V. Conclusion

Having reviewed all claims for relief, we conclude that the trial court did not abuse its discretion in certifying this class of plaintiffs. The trial court's order shows actual, demonstrated compliance with Rule 42. It is obvious from the order that the

trial court conducted a rigorous analysis, including in-depth consideration of the various objections to class certification made by Exxon. Some of the issues presented in this appeal have been matters of controlling substantive law on which no deference is given to the trial court. In these determinations, we have found no error. Other appellate issues presented by Exxon are addressed to the discretion of the trial court, with limited room for appellate review. On these, too, we have found no grounds for reversing the class certification order.

The order is therefore AFFIRMED.

## APPENDIX

### CAUSE NO. 03-60079-4

Dan GILL, Individually, and as Successor in Interest to Dan Gill, Inc., d/b/a Dan Gill Exxon, Patrick T. Morrow, Individually, and as Successor in Interest to Carrollton Exxon f/d/b/a Carrollton Exxon, Josey Lane Petroleum, Inc., d/b/a Carrollton Exxon, and Howard Granby, d/b/a Beach Street Exxon, Plaintiffs,

v.

EXXON MOBIL CORPORATION, Defendant.

No. 03–60079–4.

Texas County Court at Law,

No. 4, Nueces County.

Jan. 3, 2006.

### CLASS CERTIFICATION ORDER

JAMES KLAGER, Presiding Judge.

**BE IT REMEMBERED THAT** on the 10th day of November, 2005, came on for hearing Plaintiffs' Motion for Class Certification. Having taken notice of and considered the Court's entire file in this cause, Plaintiffs' Motion for Class Certification of this class as a common-question class under Rule 42 of the Texas Rules of Civil Procedure is **GRANTED**.

The Court has considered briefs in support of and in opposition to class certification; the documents, deposition transcripts, and affidavits filed with those briefs; and the arguments of counsel in a day-long class certification hearing. In addressing issues of commonality and predominance, the Court has considered as well the evidence and issues presented in the briefs and arguments on Exxon's Motion for Summary Judgment.

In reviewing the record, the Court has borne in mind the Supreme Court's caution that certification should only be ruled on after a "rigorous analysis" of the record, that the Court cannot certify now and only later determine how the case will be tried, and that the Court's analysis must encompass the claims and defenses of the parties and how they are likely to play out at trial. *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 435–36 (Tex.2000). At the same time, the class action rule exists because of a judgment that in some instances such a proceeding is the best, or perhaps only, way in which a large number of litigants can have their rights protected. As *Bernal* also reminds us, "[w]hen properly applied the class action device is unquestionably a valuable tool in protecting the rights of our citizens." *Id.* at 439. The Court is confident that the detailed evidentiary presentation by both sides ensures a proper record upon which the certification decision can be made.

This case concerns rebate programs that Exxon presented to its dealers through documents and meetings that promised the dealers would earn specific dollar amounts if they sold various volumes of gasoline or kept their stations open 24 hours a day. The plaintiffs allege that instead of giving its dealers the promised economic benefit,

Exxon made the dealers as a group pay for the cost of the programs by adding the full costs of the rebate as a secret charge on top of the ordinary "DTT" wholesale gasoline price. Exxon claims it told all its dealers that it was "offsetting" the cost of the rebates.

Plaintiffs seek certification of a class consisting of "all persons, partnerships, corporations, associates and entities which are and/or were at the material times Exxon-branded retail service station dealers who owned or operated Exxon branded retail motor fuel stores in the state of Texas and who entered into a standardized contract or agreement with ExxonMobil as described herein [in Plaintiffs' Second Amended Original Class Action Petition, § 9.1.]."[1]

In support of this order, the Court makes the following **FINDINGS OF FACT AND CONCLUSIONS OF LAW** on the elements of this Rule 42 common-question class:

## I. Numerosity

Texas Rule of Civil Procedure 42(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Exxon has conceded that the numerosity requirement is satisfied in this case. *See* Defendant ExxonMobil Corporation's August 2, 2004 Memorandum in Opposition to Plaintiff's Motion for Class Certification [hereinafter "Exxon Opposition"] at p. 24 (stating, "numerosity which ExxonMobil does not contest"). In addition, the record reflects that there are hundreds of potential class members.[2] The class is so numerous that joinder of all members is impracticable.

## II. Commonality

Texas Rule of Civil Procedure 42(a)(2) merely requires that there "be questions of law, or fact common to the class." The threshold showing for commonality, in contrast to that for showing the predominance of common question, "is not high." *UPRG v. Hankins*, 111 S.W.3d 69, 74 (Tex.2003). There are questions of law and fact common to the class, as illustrated by the following examples of common questions:

(1) Whether Exxon's Sales Agreements with their open-price terms precluded Exxon from adding its costs from its rebate programs to its wholesale gasoline DTT price;

(2) Whether the standard-form invoices and rebate documents that Exxon sent or had its managers show to its dealers disclosed that Exxon was adding the cost of the rebate programs to the DTT price;

(3) Whether Exxon did in fact systematically add its average market-area rebate costs to its DTT price in each market area;

(4) Whether Exxon's adding of its rebate costs to its DTT price is an act of dishonesty that takes this case out of the "normal case" under UCC § 2–305;

(5) Whether Exxon's including rebate costs in its DTT price breached its duty of good faith under U.C.C. § 2–305; and

(6) How much Exxon added to its DTT price to recoup its rebate costs.

---

1. The Court construes "material times" to encompass the period during which the rebate programs described in paragraph 4.7 of the Second Amended Original Class Action Petition were in effect in Texas, and certifies a class limited to those periods.

2. P. 5, Expert Report of Barry Pulliam, at 8 (259 dealer-operated Exxon stations in Texas as of June 1997).

Plaintiffs have shown that there are common questions of law and fact sufficient to satisfy Texas Rule of Civil Procedure 42(a)(2).[3]

## III. Typicality

Texas Rule of Civil Procedure 42(a)(3) requires that the claims or defenses of the representatives be "typical" of the claims or defenses of the class. This requirement is that the claims of the representatives be "substantially similar" to those of the class members. *Dresser Industries, Inc. v. Snell,* 847 S.W.2d 367, 372 (Tex.App.—El Paso, no writ); *see East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)(representatives and members need only "possess the same interest and suffer the same injury"). The claims of the three class representatives, Dan Gill, Patrick T. Morrow, and Howard Granby, arise from their interest as Exxon dealers who buy gasoline under the same standard Sales Agreements, from the same volume and 24–hour rebate programs, and from Exxon's allegedly secret recoupment of its costs in those programs. The representatives share these interests with the class members. The claims are based on Exxon's standardized Sales Agreements with the same open-price terms. The representatives and class members received the same standard-form documents showing their rebate thresholds (even if the actual threshold may have varied by dealer), their business managers talked to them about rebate programs from the same scripts, and they received the same form invoices that appeared to show they had earned the rebates promised. The claim concerning Exxon's add-on charge is typical of the class claims because Exxon allegedly added its total market-area rebate costs to the DTT price from each class member in the same manner—by compiling Exxon's rebate costs in a dealer's market area and adding those costs to that area's per-gallon wholesale gasoline (DTT) price. The claims for breach of the Sales Agreements, breach of the UCC's duty of good faith, and breach of promise are shared across the class.

Exxon cites a number of factual differences between the three class representatives and some other class members, for instance, that other dealers may own their own stations, have longer-term contracts, or have bay-store operations. Exxon Opposition at 52–54. These differences, however, do not affect either the claim or the damage alleged. Nor does the fact that some dealers may be current dealers and other former dealers, in a case concerning rebate programs that have all terminated.

Finally, that Mr. Gill has signed a release does not mean that his claims are not typical, nor does it make it likely that attention to this defense would harm the class. Indeed, the Court finds it likely that some substantial portion of the class may well have signed identical releases. Exxon must know how many other dealers also signed releases, but it has not presented any information showing how many other dealers did sign releases or any different terms in such releases. The Court further takes notice that in litigation against Exxon that raised many of the same substantive and certification issues

---

**3.** Exxon's Opposition contended that Plaintiffs failed to show any of the elements of a Rule 42 class except numerosity, Exxon Opposition at 24, and thus Exxon does appear to formally deny commonality. The discussion of commonality in Exxon's Opposition, however, largely focuses on what appear primarily to be issues of predominance, not a lack of common questions per se. *Id.* at 26–52. At oral argument, Exxon also focused on predominance, not a purported lack of any common issue.

as this case, the *Allapattah* litigation, in which there were roughly 10,000 class members, over 5,000 dealers had signed releases, and the Court found that all but a handful were releases with the same material terms. *Allapattah Services, Inc. v. Exxon*, 188 F.R.D. 667, 680–81 & n. 24 (S.D.Fla.1999).[4] Mr. Gill is likely to stand for a group of dealers with termination agreements that have release clauses with the same material terms.

## IV. Adequacy

Texas Rule of Civil Procedure 42(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Adequacy of representation requires competent class counsel and the absence of antagonistic interests between the class representative and the class. *Wiggins v. Enserch Exploration, Inc.*, 743 S.W.2d 332, 335 (Tex.App.—Dallas 1987, writ dism'd w.o.j.)

The primary focus in an adequacy inquiry is often the competence of class counsel. Both parties in this case are represented by highly skilled counsel, as has been reflected in the briefing and argument on various motions before this Court. Exxon has not challenged the competence of class counsel, and even a brief review of the class lawfirm resumes indicates that class counsel have the ability to prosecute this litigation effectively to conclusion. The Court's experience with class counsel in this case to date confirms their ability to adequately present the class claims. The legal team includes lawyers with extensive national class-action experience, as well as lawyers with detailed experience in oil-and-gas and gasoline dealer litigation.

Exxon's attack on adequacy is based primarily on the assertion that the class representatives' interests are antagonistic to other class members. Relying heavily on *E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565 (Tex.App.—Austin 1998), Exxon argues that the representatives have very different interests than the class, but the differences to which it points do not appear germane to the class claims. The bulk of the differences that Exxon cites, for instance the competing stations in the areas surrounding representative Gill's station, that Gill at times purchased gasoline from a jobber, and other differences in service station operation, *e.g.*, Exxon Opposition at 52–53, are not material to the rebate claims. Exxon complains about two representatives' recall of details on the rebate programs, *id.* at 55, but the depositions of all three representatives indicate that they have taken an active role in this litigation and have considerable interest in and commitment to the case.

The concerns in *E & V. Slack* are not dispositive here, and are not supported in this record. That opinion merely affirmed one trial judge's discretionary decision not to certify a class (*see* 969 S.W.2d at 567), and is not controlling in any later certification decision. The affirmance merely stated that the Court did not abuse its discretion "[e]ven when an appellate court might reach a different decision,...." *Id.* at 567, *citing Dresser Indus., Inc. v. Snell*, 847 S.W.2d 367, 371 (Tex.App.—El Paso 1993, no writ). In addition, the *E & V. Slack* plaintiffs pled a much broader case with tort, contract, and statutory theories, including breach of contract, negligent

---

4. Roughly half of the *Allapattah* class members (including class representative Gill) had entered into termination agreements with Exxon containing a release; the effect of these releases was treated on a group basis. *See Allapattah*, 188 F.R.D. 667, 680–685 (S.D.Fla.1999); *Allapattah*, 333 F.3d 1248, 1263 n. 18 (11th Cir.2003).

misrepresentation, fraud, and violations of the Texas Deceptive Trade Practices Act.[5]

This record does not show actual antagonism between the interests of the Plaintiffs and those of the class. Speculation about potential conflicts does not establish inadequacy. *Employers Cas. Co. v. Texas Ass'n of School Bds. Workers Comp. Self-Ins. Fund,* 886 S.W.2d 470, 476 (Tex. App.—Austin 1994, writ dism'd w.o.j). Even if non-speculative conflict were shown, it must go to the heart of the case to allow a finding that a proposed class representative is inadequate. *Adams v. Reagan,* 791 S.W.2d 284, 291 (Tex.App.—Forth Worth 1990, no writ).

The record shows that the proposed representatives and their counsel will fairly and adequately protect the interests of the classes.

## V. Predominance

The most pronounced disagreement among the parties in the briefing, as well as at oral argument, is over whether common questions of fact or law will predominate in the trial of this case, as required by Texas Rule of Civil Procedure 42(b)(3). The Texas Supreme Court has stated that the "[t]est for predominance is not whether common issues outnumber uncommon issues but ... 'whether common or individual issues will be the object of most of the efforts of the litigants and the court.' " *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2002) (quoting *Bernal,* 22 S.W.3d at 434). In determining which issues will absorb the bulk of the parties' efforts at trial, the analysis should turn on facts that are actually disputed and need to be tried, as opposed to either irrelevant facts or undisputed facts. *See Snyder Comms., L.P. v. Magana,* 142 S.W.3d 295, 300–01 (noting that though "[t]here are many common issues in this case, most of [them] are apparently undisputed" and finding individual issues predominant on matters actually in dispute). Here, common questions of law and fact predominate over any individual questions.

In order to determine if the controlling common issues predominate over any individual issues, the Court considers the elements of Plaintiffs' claims and any viable defenses. The Court first addresses Plaintiffs' claims. In this case Plaintiffs allege that Exxon breached its contracts with Texas dealers by promising rebates and then secretly adding the cost of the re-

---

**5.** Specific concerns that appear to have motivated the *E & v. Slack* court in its conclusions on adequacy also are not present here. The *E & v. Slack* plaintiffs seem to have conceded that present and former dealers had conflicting interests on the rent program at issue in that case by proposing subclasses for those two groups, and the court cited one current Shell dealer who did not want the Shell rent program terminated. 969 S.W.2d at 568–69. In this case, Exxon has terminated all of the rebate programs, so this continuing interest no longer exists, whatever its proper weight in *E & v. Slack.* If there are some current dealers who simply do not want to be associated with any lawsuit against Exxon, no matter what the facts, they can request exclusion from the class. *See Larry James Oldsmobile-*

*Pontiac–GMC Truck Co., Inc. v. General Motors Corp.,* 164 F.R.D. 428, 437 (N.D.Miss. 1996); *Lockwood Motors v. General Motors Corp.,* 162 F.R.D. 569 (D.Minn.1995); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 692 (D.Minn.1995).

The *E & v. Slack* court also mentioned issues about Shell's economic viability, *id.* at 569; there is no suggestion in this record that this case would jeopardize Exxon's economic viability. The *E & v. Slack* court apparently also had concerns about the plaintiffs' ability to fund the class and questions about a succession of class representatives, *id.;* again, whatever weight those factors might have upon that record, there is no basis for them to drive the outcome of this certification hearing.

bates to the price Exxon charged the class member dealers for gasoline. The contract claims are governed by the Uniform Commercial Code. In all the contracts with the class members there is an "open price" term regarding what Exxon charges the class members for gasoline. An open-price term does not, however, allow Exxon to fix any price it may wish. Texas Bus. & Com.Code Ann. § 2.305 (Vernon 2005), provides that "[a] price to be fixed by the seller ... means a price for him to fix in good faith." Based on the claims at issue, the controlling substantive issues in this case can be listed as follows:

(1) Whether Exxon and the class members entered into contracts with materially similar open-price terms;

(2) Whether Exxon created uniform rebate programs that promised dealers that they would earn rebates if they sold certain amounts of gasoline;

(3) Whether Exxon used the same methodology to compute its gasoline prices to dealers in Texas;

(4) Whether Exxon secretly added a rebate catch-back to the price of the gasoline it sold to the class members;

(5) Whether Exxon's secret rebate catch-back was a breach of Exxon's duty to price its gasoline to the dealers in good faith, and a breach of the contracts with the class member; and

(6) The aggregate amount of the rebate catch-back.

These controlling issues can be proven with common evidence. The focus of the trial is going to be on Exxon's conduct. Either it acted in bad faith and breached its contracts with the class members by adding rebate costs to its DTT price or it did not. At the class certification hearing and in their class certification briefing, Plaintiffs presented the Court with examples of documents and testimony that could be used to prove on a classwide basis that Exxon breached its obligations and acted in bad faith. Perhaps not surprisingly (given Exxon's large size and national market), its contracts, rebate programs, wholesale gasoline pricing practices, and rebate rebilling programs—as well as evidence that Exxon claims shows that it gave notice to dealers and that may go to various defenses—are all based on centrally designed, common communications and programs that were uniform in material ways throughout the company.

***The Texas Class Has Common Contracts.*** This case is pled as a contract case. Exxon has not disputed that the Sales Agreements are uniform in the most material respect—their pricing terms—across the Texas class. The contracts of the class representatives, which generally contain pricing terms in paragraph 4, contain open-price terms using one of two price clauses, either "Seller's established dealer price appropriate for the transaction and in effect at the time loading commences" or "EXXON's price in effect at the time of loading of the delivery vehicles." *E.g.*, Ex. P.1, Gill Depo., Ex. 3, § 4; Ex. 6, EGILL 0041148, § 4. These two price terms are two of the four pricing terms that the *Allapattah* Court found presented common questions across its much larger class of 10,000 dealers, in 35 states, over a period of many years. *Allapattah Services, Inc. v. Exxon*, 61 F.Supp.2d 1308, 1311 & n. 2 (S.D.Fla. 1999). Exxon has not produced class-member agreements with different terms, or pointed to any contract language to suggest that other dealers did not have similar open-price terms in their Sales Agreements. Indeed, after this Court granted Plaintiffs' Motion to Compel Exx-

on to identify any different price, integration, or notice provisions on which it would rely to oppose certification, Exxon affirmed that it would rely just on the contracts entered by the three Class Representatives. *See* March 10, 2005 Order, nos. 1–3. Thus the primary legal document upon which the claims will be decided appear uniform across the Texas class.

**The UCC Standard Will Be Uniform for the Class.** Exxon has not disputed that all of these Sales Agreements are subject to the UCC;[6] and it has not advanced any argument that the UCC might apply to some dealers' contracts with Exxon, but not to other dealers. The purpose of the UCC is to provide a consistent set of standards for commercial cases. The standard of good faith in Tex. Bus. & Comm. Code Ann. § 2–305(b), the definition of good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing," *id.* § 1.201(b)(20), the meaning of a "normal" case that satisfies the duty of good faith under article 2.305, *see id.* § 2.305 cmt. 3, and such factors as the notice provision in § 2–607 upon which Exxon relies will all be decided under a common statutory standard that applies to the entire Texas class.

Exxon's Sales Agreements have an "open price" term regarding what Exxon charges the class members for gasoline. Texas Bus. & Comm.Code Ann. § 2.305(b) (Vernon 2005), provides that "[a] price to be fixed by the seller ... means a price for him to fix in good faith."

Whether Exxon's alleged conduct in secretly catching-back the rebates in the price of the gasoline it sold to the class members was in bad faith will involve a determination under § 2.305 of whether the circumstances here constitute a "normal" case. *Id.,* Comment 3. This, too, is an issue that can be resolved for all members of the class using common evidence—either Exxon's alleged secret rebate catch-back takes it out of the "normal" case or it does not.[7]

**Exxon's Rebate Programs Had Uniform Terms.** The detailed evidence submitted by the parties shows that Exxon sponsored volume and 24–hour rebate programs whose material terms were uniform across the state and, indeed, across the country. Exxon's initial interrogatory response stated that the RASPP and VIP volume programs were available in states including Texas from at least 1990 until approximately 2004. P. 52, answer to int. no. 1.

The undisputed evidence shows that Exxon prepared uniform scripts to explain the programs to its dealers. P.20 is one such script for a test phase of the RASPP volume rebate program. Under "introduction," the script states that the program will be administered "uniformly," and that "all dealers within the program test markets are automatically included." *Id.* at 1. Testimony of Exxon witnesses indicates

---

**6.** In its August 10, 2004 Motion for Summary Judgment, Exxon relied on various UCC provisions to support its position, particularly Tex. Bus. & Comm.Code Ann. §§ 2.607 and 2.725(a).

**7.** In *Allapattah* both the breach and normal case issues were tried on a common basis using common evidence. The jury instructions and special verdict from *Allapattah* show how these issues were and can be tried

on a class basis. The *Allapattah* jury found, among other things, that a normal case did not exist, that Exxon had acted in bad faith when it set its gasoline prices to its dealers, and the amount in cents per gallon per year that Exxon had failed to reduce its gasoline price to its dealers. P. 22, issue nos. 1, 2.b, 5; P.24, inst. No. 9 (good faith), 9A [page 15] (normal case), 10.B (extent of good faith), 13 (damages) [*Allapattah* special verdict form].

that all dealers were automatically included in the volume programs, which therefore were mandatory programs. Exxon Sur–Reply, Ex. 9, Debree Depo., at 137:9–13. Dealers could not opt out and buy other gasoline, because the Sales Agreements were exclusive purchasing agreements that required dealers to purchase Exxon-brand gasoline from Exxon. *E.g.,* P.2, Granby Depo., Ex. 6, G087694, § 2.2.2. The uniform script told dealers that the rebate program was designed to give them financial "incentives" and documented the incentive to the penny by showing how much they would be rebated if they sold more than specified threshold volumes. P.20, at 1–2. The rebate credit was to be shown on the following month's rental invoice and would "reduce the total amount due Exxon." *Id.* at 2.

Exxon's business managers had computerized programs that let them show Exxon's dealers the rebates they would earn by selling more than their assigned volume thresholds. Exxon Sur–Reply, Ex. 9, Debree Depo., at 118:9–17. Those calculations did not include the amounts Exxon added back to the DTT price. *Id.* at 118:18–119:13.

Further evidence of commonality is that changes in rebate programs were also announced by uniform documents. An example of one such form letter is in P. 36, a form letter announcing a change in Exxon's 24–hour rebate program.

Exxon has not identified any documents prepared as part of a rebate program that told the dealers Exxon was billing them for the costs of Exxon's rebate programs, or that explained the mechanics through which Exxon in fact added those costs to the DTT price. Nor has Exxon identified any documents sent to dealers to describe the rebate programs that gave different,

individual information on terms material to the parties' dispute.

Exxon's written outlines were so important that Richard Debree, an Exxon business manager, initially testified, "Whatever the outline says in the Raspp was my understanding" when asked question about the rebate programs to its dealers. Exxon Sur–Reply, Ex. 9, Debree Depo., at 36:3–4; *see also id.* at 40:8–13, 41:9–17. The record shows that Exxon prepared uniform national documents designed to ensure that the same basic communications were sent to its dealers, including the dealers in this Texas class.

Class members received standard-form invoices which seemed to show that they had indeed earned the rebate credits promised by Exxon. Two examples of such invoices are in Exs. P.32 and P.33. For instance, P. 32 shows Exxon rebating dealer Gill $149.00 for the VIP Supreme Incentive program and $975.00 for the VIP Incentive program. The invoices show specific dollar amounts that Exxon was giving back (rebating) to the dealers. Dealers received these form invoices every month. These invoices do not disclose that Exxon was going to add the costs from any rebate programs to its DTT price, or in some other way bill those costs to Exxon's dealers.

Class members also received common standard-form invoices billing them for each gasoline delivery. P. 34. A sample of such invoices is in P. 34. The gasoline invoices list, by octane, the DTT price to which the class alleges Exxon secretly added its rebate costs, but they do not disclose that Exxon was adding this cost to the DTT price.

Thus the record shows that Exxon prepared common classwide scripts to inform and educate dealers about the rebate programs and changes to those programs. The common scripts promised specific, to-

the-penny financial benefits that are at the heart of the claims made here. Exxon sent a large number of standard-form invoices to the dealers and these invoices listed the dealers as earning what had been promised. None of these documents disclosed that Exxon was adding the rebate costs onto the DTT price, so that the dealers in effect were paying for their own program. It is a common question whether Exxon's practice of rebilling these costs breached the rebate promises and commitments that Exxon made in its rebate program documentation.

Exxon says for purposes of certification that what its dealers knew varies individually, but at the same time even it argues that it sent a uniform message to the dealers and it points to classwide evidence on this issue. Exxon claims that it told all of its dealers that it was "offsetting" its rebate costs by increasing its DTT price. As examples, Exxon cites such evidence as minutes from national dealer meetings, Exxon Sur–Reply, Exs. 14, 15; testimony of Exxon employee James Carter that Exxon informed all dealers (*see* Exxon Opposition at 35); and testimony about dealers from locations far outside Texas. Thus Exxon's evidence, too, demonstrates that in this case questions of what Exxon told its dealers present a common question.[8]

*Exxon's Gasoline Pricing Computations Were Uniform.* Exxon's procedures for setting its DTT price, the price whose inclusion of rebate costs is challenged by the class, were uniform for the class over the class period. Exxon corporate representative Alan Jackson, its witness on DTT pricing, testified for Exxon that its "methodology" for establishing DTT prices was uniform from 1989 through 2002 and the same in each market in the United States. P. 49, at 34:23 –35:5.

*Whether Exxon Recouped its Rebate Costs Is a Common Issue.* Plaintiffs allege that Exxon recouped the cost of the rebate programs in a uniform common practice of computing its average total rebate cost in each "market area"—large, multi-station geographic areas into which Exxon divided the country—and then adding those costs onto the DTT price in each market area. Second Amended Original Class Action Petition, § 4.10. It points to a large body of evidence suggesting that Exxon did add its rebate costs to the DTT price classwide (indeed, nationwide) in this manner. As an example, the class cites the testimony of Exxon's James Carter, an executive with responsibility for gasoline pricing:

Q. Do you or do you not, if the rebate costs Exxon on an average basis in the market place a penny, do you or do you not reflect that additional penny in the adjustment when you compare your DTT to the other majors?

A. Yes, that's what I just said.

Q. Okay. And doesn't that mean that if the rebates cost you a penny more that all things being equal, you would invoice that dealer a penny more on his gasoline price?

A. That's correct.

---

**8.** Plaintiffs also point out that in the *Allapattah* litigation, which the federal court in Florida certified as a 35–state class, Exxon also argued that such questions as what dealers knew and their understanding were individual and varied by dealer. This is the position Exxon took in its briefing in Opposition to certification. P. 30, Exxon's Opposition to

Plaintiffs' Motion for Class Certification, at 5–7 (for example, see Exxon's claim that "some dealer's received representations on the DFC program, others did not, and that what was said—or is claimed to have been said—at these meetings varied dramatically from meeting to meeting and dealer to dealer"), 16.

Q. So you took the rebates right back, didn't you?

A. On average, yes.

P. 13, at 585:10–25; *see also id.* at 595:10–14.

The class also points to a series of Exxon internal management memoranda that discuss the rebate programs in terms that a jury could find show common recoupment practices across the class. For instance, on page 2 of the 1998 memo in P. 16, Exxon employee Mort Voller discussed "the real reason DTT's have to be raised to offset the rebates" and that "DTT has to be increased to offset the cost of program on day one." In P. 41, the same Exxon employee, Mort Voller, wrote in an earlier January 26, 1988 memo on the 24–hour Hours of Operation Program that "Management has approved the program subject to offsetting the expense of the rebates with a DTT adjustment." In P.14, a January 16, 1995 memo, Mr. Voller noted that such rebates offered to dealers as the volume "VIP" program "can only be subsidized by higher DTTs," with the result that dealers "to a greater and greater extent, are experiencing higher, every-day invoiced pricing for the benefit of a once-a-month credit on the statement." P. 14, page 1.

Earlier in this case, it did not seem that Exxon would deny that it on average recouped its rebate cost in its DTT price. At a hearing in this case on January 8, 2004, Exxon's counsel stated the following:

Now, I will tell you was—and there's no question about it—was—were the rebates on average factored in like other costs were ultimately? The average rebate cost was.

P. 47, at 38:25—39:3.

Some of Exxon's evidence suggests that it may now dispute whether it actually recouped full rebate costs "on average" in its DTT price. In its Opposition, for instance, Exxon claims that its considers and weighs numerous pricing factors differently in each price zone, and that "There is simply no legitimate way to correlate movements in the average market volume rebate payouts to movements in the DTT price at any specific point in time." Exxon Opposition, at 15. Any such denial that Exxon did recoup its costs still would present a classwide dispute on the merits. The Court is not to resolve merits issues on class certification. *Snyder,* 142 S.W.3d at 301 (citing *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996)).

In addition, the Court notes that any position that Exxon's DTT pricing is so subjective by price zone that discrete components of the DTT price cannot be isolated contradicts the jury findings and the published opinions in the *Allapattah* litigation. While this Court is making its own independent determination, the *Allapattah* litigation concerned the same Exxon DTT prices set, as testified by Exxon's corporate representative Mr. Jackson, under the same methodology for many of the same years. The fact that another jury and several Courts looking at those prices found it is possible to isolate particular price components classwide indicates that this is a disputed merits issue that should not be decided at the certification stage.

*Allapattah* involved a different promise than this case—a promise of DTT price reductions based on a discount-for-cash program—instead of the rebate promises at issue here. Yet Exxon raised—and lost—on the same inherently individual damages argument that it raises here to oppose certification. An order issued by the *Allapattah* federal Court in May 2005 indicates that the Plaintiffs in *Allapattah,* like the Plaintiffs here, alleged class-wide, average per gallon damages. Exxon, in contrast, "complained particularly about Plaintiffs' intention to prove damages on

an annualized, cents-per-gallon basis that would apply to each member of the Class." P. 56, Order on *Allapattah* Plaintiffs' Sanctions Motion, at 3. Thus Exxon claimed in *Allapattah*, as it does here, that it is not possible to prove classwide damages given Exxon's various practices. Exxon lost on that issue in *Allapattah*. The trial Court "entered a number of orders rejecting Exxon's arguments and ultimately adopting Plaintiffs' proposed special jury verdict" providing for damages on a common cents-per-gallon, annual basis. *Id.* The jury found specific cents-per-gallon damages, year by year, for the entire national class. P. 22, issue no. 5. Thus it treated damages based on a discrete component of Exxon's DTT price as a common, not individual, question.

Even after it lost on this issue at trial, Exxon continued to argue that damages had to be proven individually. P. 56, at 6 (referencing Exxon's argument that "Plaintiffs had failed to prove that any dealer had been damaged, that damages would have to be established on a dealer-by-dealer basis in the claims administration process . . . ."); *id.* at 7 (referencing Exxon's argument that some class members were damaged more than others). The trial Court rejected this position and held that Plaintiffs had established classwide damages. *Id.* at 7–8; *see generally id.* at 7–11.[9] Exxon next raised its individual-damages argument on appeal, where it claimed that the trial Court erred in allowing an on-average "cent-per-gallon damage award . . . because the jury had not found that the named Plaintiffs or any individual dealer was in fact damaged." *Id.* at 22. The Eleventh Circuit also rejected this attack, *id.* at 25 (*citing Allapattah*, 333 F.3d at 1256 n. 8), and it affirmed the common on-average damages model, P. 56, at 26–27. Exxon then raised, and lost, the same individual damage point in a motion for rehearing, and in an application for certiorari in the United States Supreme Court. *Id.* at 27–29.

This sequence from *Allapattah* is relevant in confirming that a jury, and several Courts, have upheld findings that components of Exxon's DTT price can be isolated on a common, classwide basis. The various Exxon documents cited above, and testimony from some of its employees, indicate the same thing. Exxon has admitted through a corporate representative, Mr. Jackson, that its DTT pricing practices are uniform. To the extent that Exxon now claims its practices were so subjective that it is impossible to isolate or prove an on-average rebate computation, that is a common, classwide dispute that is likely to take a substantial part of the parties' efforts.[10] Which party is correct on this point is, of course, a merits issue that is not properly before this Court at the certification stage and ultimately will rest with the factfinder.

***The Damages Sought Present Common Issues.*** The allegations in the Sec-

---

9. The court rejected Exxon's post-trial argument that damages are inherently individual: "Accordingly, I clearly rejected Exxon's argument that each claimant must prove the amount, if any, Exxon actually overcharged the dealer through which the claimant is claiming and the amount the dealer was damaged by that overcharge." P. 56, at 10–11.

10. The Plaintiffs argue that Exxon's position that it merely "factored" in its rebate costs in a subjective way also seems contrary to P.48, at EMFL 00397454. This document, comparing the former Exxon and Mobil rebate programs, lists *Mobil* as treating rebates as "Factored into pricing decision," but describes the *Exxon* policy as "Adjust DTT to cover costs of rebate." The dispute over what Exxon actually did is a common dispute, and it is a question involving the merits.

ond Amended Original Class Action Petition should permit classwide computation of damages. The expert report of an economist for Plaintiffs, Mr. Pulliam, discusses standardized Exxon computer reports through which Exxon kept track of its monthly rebate costs by market area—the very costs that Exxon allegedly added back to the DTT price charged to every dealer in that market area. The report of Mr. Pulliam discusses Exxon reports entitled The Rebate Report, The UR Margin Report, The Wholesale Price Monitor Report, Mogas Dealer Monitor / Mogas Market Adjustments Report, Retail Auto Store Performance Report, Volume Incentive Program, and Computerized Volume and Rebate Data. Pulliam Report, P. 5, pages 5–7. Mr. Pulliam attached a computation showing how he could compute the damages alleged for the sample month of June 1997 using this data. *Id.* at 7–8 & Ex. 8. Exxon has not denied that, if Plaintiffs prevail and persuade the jury that Exxon did "on average" recoup its average rebate costs by market area, damages can be computed from such records.

Both in its briefing and at oral argument, Exxon discussed a number of issues affecting an individual dealer's mathematical damages claim that, Exxon contends, should help make individual issues predominate. But while some of these issues may affect whether a given dealer has a claim for damages in a given month, they are capable of objective determination, should not involve disputed amounts, and therefore should not consume any substantial time at trial. Exxon says that it started and stopped rebate programs at different times in different areas. This will affect whether dealers in a given market area have a claim for a particular month, but the period when programs were in effect should be capable of objective determination (indeed, whether rebates were being paid out in a market area should determine whether there was any add-on in that area in the following month on the Exxon forms discussed by Mr. Pulliam). Similarly, such factors as the total gallons sold by a dealer in a given month will affect the volume base for that month's damage computation, but that is also determinable from Exxon's records.

Other factors cited by Exxon do not seem to affect the damage computation at all. For instance, Exxon claims that rent waivers and volume adjustments may have been given to certain dealers. But there is no evidence that either factor exempted any Exxon dealer from Exxon's average, market-area practice of adding its rebate costs as a surcharge to the DTT price, which is what this case concerns. Because the case is only over the monthly market-area rebate add-on to the DTT price charged in that market area, such other factors as the competing service stations surrounding a given dealer, its marketing practices, the absolute or total level of the DTT, whether a dealer owned or leased a station or had bay service as well as gasoline pumps, or the profits made by a dealer—all factors that may vary individually—do not affect the claims in this case or the damages sought.[11] *See generally Sny-*

---

**11.** Exxon argued several times at the certification hearing that damages are individual because the net benefit to each dealer, "who's better off or who's not better off," varies by dealer, Gill certification hearing at 124: 5–7, and that a dealer who received a larger rebate than other dealers or than the average re- coupment in the area would have no claim, *id.* at 129: 18–24, 141: 19–24. Exxon also claims that dealers who did not participate in programs would have no claim. *Id.* at 125: 1–5. This position misconstrues the claim and damages alleged. Plaintiffs are not basing damages on net profitability. The dealer

der Comms., L.P. v. Magana, 142 S.W.3d 295, 300–01 (Tex.2004) (commonality not fairly tested by issues not really in dispute). While each dealer's amount of damages may vary, *how* the damage amounts will be calculated will not. This is close to the "ideal" situation mentioned by the Supreme Court in *Bernal;* a decision by the jury on whether Exxon recouped in the manner alleged by Plaintiffs will let it determine damages for the entire class based on volume and average-rebate-cost evidence that should be itself undisputed.

***Exxon's Defenses Present Predominantly Common Issues.*** In its Opposition, Exxon argues that five groups of defenses present individual issues that should preclude certification: voluntary payment, accord-and-satisfaction, release, notice, and limitations. Exxon Opposition 39–48. Yet these defenses either are not supported in the record shown or are based on predominantly common evidence.

Exxon's voluntary payment defense is based on its claim that dealers had paid their gasoline invoices with "full knowledge" of the facts and so are not entitled to recover in this case. Exxon Opposition, at 40. The Texas Supreme Court has recently held that this defense applies to claims of restitution and tax refund claims, but not to breach of contract claims, the claims pled here. *BMG Marketing, Inc. v.*

*Peake,* 178 S.W.3d 763, 770 (Tex.2005) (discussing application of doctrine in claims for restitution of unjust enrichment and tax repayment claims), at 774 ("to the extent the subject matter of Peake's claims is covered by the parties' contract, the rule would not apply"). Second, the doctrine can only apply "in the absence of fraud, deception, duress, or compulsion." *Id.* at 768. The class has alleged a systematic program of concealment by Exxon to not disclose its rebilling or rebate costs.[12]

Exxon's second defense that it contends introduces individual issues is accord and satisfaction. As Exxon admits, an accord and satisfaction requires "a conspicuous notice to that effect" that a payment was meant to satisfy a known claim. Exxon Opposition at 41. Exxon would know if it had instruments or payments with conspicuous notice of accord and satisfaction, and would have exclusive control over such information. The class asked Exxon to identify any such notice in discovery. Class August 26, 2004 Motion to Compel, at 12–13. Yet Exxon has not suggested any writing that would give notice of an accord and satisfaction, much less conspicuous notice of such a resolution. While the class has the burden of showing its entitlement to certification, Exxon cannot oppose certification by pleading defenses for which it cannot produce any evidence.

Exxon's third defense is release. As discussed above, the class has shown that

claim and the damages rest on Exxon's alleged adding its rebate costs to the DTT price, a practice that Exxon allegedly implemented by market area. If the class persuades the jury that this practice was improper, it was improper regardless of the size of the rebate a dealer had already collected or whether a dealer was formally participating in a rebate program or not, because all dealers in a market area allegedly received the same improper per-gallon add on.

12. The Supreme Court also noted in *BMG Marketing* that the voluntary payment defense may be tried as a common-question upon a proper record. *BMG Marketing,* 178 S.W.3d 763, 2005 WL 3077425, at *12 ("we decline to hold that a class can never be certified when a defendant asserted a voluntary-payment defense"). As discussed below in the section on notice and limitations, in this case the issue of "full knowledge" would still raise predominantly common issues.

Mr. Gill had a release and that, in *Allapattah,* in which almost half the class had signed termination agreements with release clauses, the Court found that the terms were materially the same for all but a very small number of releases. The class also sought discovery from Exxon of any facts on which Exxon relied to show individual differences in releases, and this Court granted a motion to compel such answers. March 10, 2005 Order no. 4. While Exxon claims that "ExxonMobil would be entitled to pursue discovery and present evidence about dealership terminations and releases that may bar dealers, such as Mr. Gill, from recovering under the claims here," Exxon Opposition at 42, Exxon has not cited any different terms from Mr. Gill's release to the Court. The common questions surrounding the release include the legal question whether the exceptions to release for "trade accounts" and "reimbursements" exclude these claims, and so render the defense ineffective as a matter of law. *See Allapattah,* 188 F.R.D. at 681 n. 24. If the release defense is not decided as a matter of law, any claim over what dealers knew when they signed their termination agreements would be subject to the same common proof discussed below.

The two other Exxon defenses cited as impediments to certification involve limitations and notice. Exxon Opposition at 42–48. On each defense, Exxon claims that the evidence will require case-specific analysis of whether each dealer knew that Exxon was adding its rebate costs to the DTT price. In support of this position, Exxon's sur-reply attaches four affidavits from Exxon dealers, and an affidavit from a business manager, to claim that what dealers knew is an individual issue.

One salient fact about the evidence on what Exxon disclosed is that both sides claim Exxon disseminated uniform, national communications on its rebate programs. The class cites scripts prepared for the program, invoices that showed dealers the rebates they supposedly had earned, and gasoline invoices that did not disclose the rebate costs that allegedly were added to the DTT price. Exxon has cited minutes of meetings of national and regional dealer representatives, including regional meetings in New Jersey and other areas far from Texas (Exxon Surreply, Exs. 13, 14, 15) to say that it *did* tell its dealers that it was adding its rebate costs to the DTT price. It is a common, classwide dispute whether the information cited by Exxon provided notice that is germane to its limitations and notice defenses.

Exxon points to its four dealer affidavits and one business manager affidavit, but none of these affiants indicate an awareness that Exxon was offering a program that the dealers paid for entirely by themselves, that had no net benefit to them as a group, or that Exxon was adding the full costs of the rebate programs to the DTT price. Three of the affiants and the only business manager are from either Virginia or New Jersey–New York, with no listed connection to this Texas class. One of the affiants, Mr. Gupta, seems to actually deny that Exxon added rebate costs to the DTT price, Exxon Sur–Reply, Ex. 8, Gupta Depo., at 59:4–5 ("A. See, first of all, it was not taken back by Exxon. . . ."), 59: 12–13 ("No, no, the DTW was reduced not increased."), the opposite of Exxon's contention that dealers knew Exxon was adding these costs. Another affiant, Mr. Sheehan, claims that he did not waive any rights to participate in the class, Exxon Sur–Reply, Ex. 7, Sheehan Depo., at 222:22–223:4, a position inconsistent with any claim that he understood what Exxon was doing. The only Texas affiant, Mr. Nemry, would not even be a class member, because he is the son of a dealer rather

than the dealer himself. Moreover, Mr. Nemry also claimed that he, too, had not waived anything and was reserving his rights to participate. P. 55, Nemry Depo., at 84:19–86:7; 88:16–18. There are also credibility questions surrounding the affidavits.[13]

Exxon's dealer evidence goes to a larger common issue, one that can be proven with classwide discovery into Exxon's practices of communicating with dealers on its rebate programs.

On this record, common questions of fact and of law will predominate in the preparation and trial of this lawsuit.[14]

## VI. Superiority

Texas Rule of Civil Procedure 42(b)(3) requires the Court to find that class treatment is "superior to other available methods for the fair and efficient adjudication of the controversy." This analysis includes consideration of the class members' interest in controlling the actions individually, the extent of any other litigation by or

---

13. Some of these credibility issues are raised by plaintiffs' recently filed Motion to Limit Defendants' Communications with Putative Class Members and for Other Relief and include questions about the context in which the affidavits were generated. Others pertain to what appear to be direct contradictions even between the positions presented. For instance, Mr. Nemry claims to have determined that Exxon was recouping its costs by comparing his DTT price to the Shell DTT. As the class points out, this appears to contradict even Exxon's position, which is that "There is simply no legitimate way to correlate movements in the average market rebate payouts to movements in the DTT price at any specific point in time." Exxon Opposition at 15. Or, as another Exxon affiant Mr. Sheehan testified, "No prices are changing all the time. I have no way of knowing when prices change, what the specific cause of that change is." Exxon Sur–Reply, Ex. 7, Sheehan Depo., at 230:9–12.

14. Exxon again relies heavily on *E & V. Slack* in its commonality arguments. Yet not only was the *E & V. Slack* opinion merely holding that the trial court did not abuse its discretion, but the opinion reveals several important differences between that case and the facts here. First, the court listed the "commercial reasonableness" of the DTW price as an issue raised by the pleading. *E & V. Slack*, 969 S.W.2d at 570. As the Texas Supreme Court recently indicated in *Shell v. HRN*, 144 S.W.3d 429 (Tex.2004), in Texas a party merely challenging the commercial reasonableness of an open-price without other factors must show price discrimination. *Id.* at 434–36. This case, unlike *HRN* and apparently *E & V.*

*Slack,* includes specific claims of dishonesty in fact based on Exxon's promise of a rebate and acts allegedly taken to remove the benefit promised. *See HRN*, 144 S.W.3d at 436 (discussing *Allapattah* and one other case as recognizing "that a price, commercially reasonable on its face, may nevertheless be applied in a dishonest fashion.").

Second, the *E & V. Slack* court listed as individual questions a variety of factors that either are undisputed in this case, or that will be subject to common proof—such factors as whether dealers participated in a program, the DTT price actually charged, and what Exxon added to its DTT price. It is notable that even the *E & V. Slack* opinion supports plaintiffs, not Exxon, on the major item that Exxon claims creates individual issues—dealer knowledge. After listing as a source of individual issues factors that include "whether each dealer knew or should have known of the basis for his claim," the court held concerning this and related issues *"while they alone do not destroy the class as a matter of law." Id.* at 570–71.

This case is much closer to *Allapattah* than to *E & V. Slack*. As the Eleventh Circuit in *Allapattah*, 333 F.3d at 1261:

We find that Exxon's argument that each breach of contract claim raised an individual issue is without merit. Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation owed to the dealers as a whole. Whether it breached that obligation was a question common to the class and the issue of liability appropriately determined on a class-wide basis.

against class member, the desirability of concentrating the litigation in the forum, and the difficulties of managing the case as a class. Tex.R. Civ. P. 42(b)(3)(A)-(D). The purpose of a class action is to "eliminate or reduce the threat of repetitive litigation," "prevent inconsistent resolution of similar cases," and allow a mechanism to litigate claims that would be uneconomical to pursue on an individual basis. *Ford Motor Co. v. Sheldon,* 22 S.W.3d 444, 452 (Tex.2000).

The record does not suggest any strong interest in Exxon dealers bringing suit individually against Exxon. Indeed, the detailed threshold battles already fought in this case, including a removal action filed by Exxon, the later remand of the case to this Court, Exxon's Motion for Summary Judgment, and discovery disputes, suggest that the course of litigation would be prohibitively expensive in individual litigation. Moreover, one of the factors Exxon cites, the potentially different interests in some circumstances of current dealers because of their ongoing relationship with Exxon, suggests that for those dealers participation in a class may be particularly preferable than the prospect of direct litigation against the company upon which they rely for their livelihood.

The parties have not brought any other litigation over this subject matter involving Texas dealers to the Court's attention. The Court is aware of the later-filed Florida litigation involving dealers in other states, but that case does not include any Texas dealers. Thus, this factor does not provide a basis for deferring to any other forum.

The nature of these claims and the cost and complexity of the litigation makes it desirable to concentrate the case in this forum, as opposed to individual cases. It would be inefficient, costly, and a waste of judicial resources, as well as an invitation for conflicting results, to require each class member to litigate the common issues presented in this cause in multiple individual cases. Not only would responding to Exxon's defensive pleadings and arguments likely require an individual litigant to incur legal fees and costs far in excess of that dealer's damages, but in addition, it would be extraordinarily wasteful for the judicial system if similar lawsuits had to be replicated on an individual basis.

In fact, without a class the courthouse door would most likely be shut to many of the class members. Here, the core issues can be decided for all class members using common proof. Thus, a class action is the superior method for the fair and efficient adjudication of this action.

Finally, as detailed in the trial plan, this single-state case under Texas law, based upon common agreements, the UCC, and Exxon's common company practices, should yield a very manageable trial. It is notable that the *Allapattah* federal Court tried a much more complex case, one involving 35 different states' laws and 10,000 dealers. While Exxon points to the fact that *Allapattah* has taken roughly 15 years to reach its current post-trial stage, that not only indicates all the more why individual litigation is unlikely, but illustrates the benefit that Courts trying similar claims have because *Allapattah* provided a full airing of issues that are once again being raised in this litigation.

The Court finds that proceeding in this case on a class basis is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. Trial Plan

The record recited above describes a case in which the factual issues can be tried to a single jury. The case concerns Sales Agreements common to the class,

under the standard commercial provisions of the Uniform Commercial Code, and concerns only Texas dealers. The three legal claims, breach of the Sale Agreements, of the UCC duty of good faith, and of promise, are common to the class. The facts and legal questions surrounding Exxon's defenses are common to the class and can be tried to a single jury.

### Plaintiffs' Claims:

The Plaintiff class consists of Exxon gasoline dealers in Texas who bought gasoline directly from Exxon under the form Sales Agreements that ExxonMobil ("Exxon") used with all of its Texas dealers during the time period when Exxon's volume-incentive and 24–hour rebate programs were in effect. Exxon divided its Texas dealers into market areas. The common underlying factual dispute discussed above relates to whether Exxon recouped the rebate costs in its wholesale gasoline (DTT) price, whether Exxon told its dealers about this rebilling, whether Exxon breached its undertakings including whether Exxon set its DTT prices in good faith, and the amount of damages Exxon caused by breaching its commitments. Other common issues include Exxon's defenses of voluntary payment, accord and satisfaction, release, notice, and limitations.

Although this order has already discussed the evidence at length above, this section briefly discusses how the evidence can be fairly and manageably tried in a single class action to a single jury:

### The Texas Class and the Common Contracts.
The class is by definition formed of dealers linked to Exxon by common agreements with open-price terms. Because of the uniform way Exxon conducted its business, it appears to have used open-price terms with all of the dealers buying gasoline from it during the time period when the rebates were in effect. In spite of discovery directed toward uncovering any dealer agreements with different price terms, Exxon did not identify materially different language in Sales Agreements at the certification hearing. Thus, the jury will be hearing evidence about breach under common Sales Agreements.

### The UCC Standard and Claims Pled.
The Plaintiffs' three causes of action raise legal issues and standards common to the class. It will be a common issue for all dealers whether Exxon's rebate statements and representations are actionable as course of performance evidence affecting the sales agreements under the UCC, under the UCC duty of good faith, or as a separate promise. Every dealer in the class had a Sales Agreement that falls under the UCC, and every dealer's gasoline purchases are subject to the UCC.

The applicable legal standards for determining the admission of evidence concerning the Sales Agreements, including usage of trade and course of performance evidence, as well as the duty of good faith applicable to that agreement, are common to the class and provided by the Texas Uniform Commercial Code. The federal Court in *Allapattah*, finding the Code sufficiently uniform across 35 different states to provide a single rule of decision for that class, noted that a purpose of the Code was to make the law more uniform. *Allapattah*, 188 F.R.D. at 671; Tex.Rev.Civ. Stat. Ann. 671–102(c)(purpose to "make uniform the law among the various jurisdictions").

On the basis of this evidence, the Court can instruct the jury in the basic legal claims by asking whether Exxon's promises indicated that it would bear the cost of the rebates; whether Exxon breached this promise or its duty of good faith; and the appropriate amount of damages. Because Exxon designed common, classwide com-

munications to inform its dealers about its rebate programs, it will be a common factual question whether Exxon made the promise alleged by the class. The jury deciding the much larger class case in *Allapattah* was given a single instruction for that 10,000–dealer, 35–state class, an instruction that was designed to reflect Texas law as well as the law of the other states. An instruction modeled on that instruction would read:

> Do you find by a preponderance of the evidence that Exxon was contractually obligated under its sales agreements to refrain from adding the costs of its RASPP, VIP, and 24–Hour Rebate programs to the wholesale DTT price of gasoline?

If the jury answers this question yes, the jury will get an issue asking whether they find that Exxon breached this obligation. An example of how this issue could be phrased would be:

> "Do you find by a preponderance of the evidence that Exxon included its rebate costs, on average, for the RASPP, VIP, and 24–Hour Rebate Program, in the wholesale DTT price of gasoline to its dealers?"

As in *Allapattah*, Plaintiffs also allege that Exxon violated the UCC statutory duty of good faith. The violation is based upon the common evidence of Exxon's rebate program, compared to the disputed issues concerning whether Exxon actually recouped the on-average costs of its rebate programs. The jury should be presented, again as in that case, with a single jury issue in this area:

> Do you find by a preponderance of the evidence that Exxon had a good faith obligation to its dealers to refrain from adding to costs of its RASPP, VIP, and 24–Hour rebate programs to its wholesale DTT price of gasoline?

If the jury answers the good-faith issue "yes," it will be asked to answer whether Exxon breached this obligation, too. One way of phrasing this question would be:

> With respect to any good faith obligation you found in answer to Question 2, did the Plaintiffs prove by a preponderance of the evidence that Exxon failed to set its wholesale prices of motor fuel to its dealers in good faith during the Class Period?

The jury will also get a third issue on Plaintiff's breach of promise cause of action:

> Do you find by a preponderance of the evidence that Exxon was contractually obligated by its promises to refrain from adding the costs of its RASPP, VIP, and 24–Hour Rebate Programs to its wholesale price of gasoline?

This issue would also be followed by an issue of breach.

***The Evidence of Uniform Rebate Programs.*** The basic contours of the rebate program are uniform across the class. There does not seem to be any real dispute but that Exxon drafted common written documents—both scripts and such documents as the monthly credit invoices—to educate dealers on the program and inform them of the specific financial benefit that Exxon was offering. Those standard written documents promise very specific, to-the-penny rewards both for selling various volumes of gasoline and for staying open 24 hours.

***Exxon's Gasoline Pricing Computations.*** Exxon has conceded that it used the same basic DTT pricing methodology throughout the class period. P. 49, at 34:23 –35:5.

***The Common Evidence of Whether Exxon Recouped its Rebate Costs.*** The record presents a dispute over whether Exxon did, or did not, on average add the

costs of its rebate program to the DTT price by market area (or any particular area), but this is a classwide dispute that will be addressed through Exxon's company documents, testimony by Exxon officers, and presumably expert testimony. The class has already identified a number of Exxon documents and testimony that it claims support its argument that Exxon did make the average DTT price adjustment, including the testimony of Mr. Carter and documents authored by Exxon's Mort Voller. Exxon relies on testimony of its employees to deny that it recouped its costs systematically. The dispute that has arisen over this issue is one example of the complexity of common issues that makes class adjudication superior to individual adjudication. This issue also will be addressed through company documents, testimony of Exxon employees, and presumably expert testimony.

**The Common Evidence on Damages.** The record shows, particularly in the report of Mr. Pulliam, that Exxon maintains records that permit computation of damages for each station using the station's monthly volumes times the average per-gallon cost of the rebate programs, *if* the class persuades the jury that Exxon in fact added those costs back to the DTT price. Indeed, given these records, the computation of damages appears mainly an exercise in mathematics based upon objectively verifiable sales volumes and rebate costs already stored in Exxon computer records.

In *Allapattah,* the Court left for post-trial proceedings the computation of damages for individual dealers. This process, which apparently was intended to be more efficient, has consumed substantial additional time and resulted in a sanction against Exxon for delay in paying damages to individual dealers. P. 56. On the record here, the jury could be asked to deter-

mine the full amount of damages for the class, *if* it finds that Exxon did indeed recoup the on-average amount of its rebate costs. The volumes for each station and the amount of the on-average costs are listed in Exxon's own records. The amounts could be paid into the registry of the Court and any amounts not claimed by dealers who documented their ownership of the claim or who simply chose not to file a claim could be returned to Exxon. (Presumably the claims administration process in *Allapattah,* which covers many dealers who are also in this class, should facilitate the mechanics of identifying individual dealers).

**Defense Claims:**

Exxon's certification briefing raises five defenses in which, Exxon contends, individual issues predominate. The Court finds that these issues, too, can be tried as common questions.

**Voluntary Payment.** As discussed above, the recent decision issued by the Texas Supreme Court, in *BMG Marketing,* states that the voluntary payment defense does not apply to this class. In addition, were the doctrine to apply, there are classwide issues of "concealment" in Exxon's not disclosing its rebilling of rebate costs, and of dealer knowledge, that could be tried to the class.

**Accord and Satisfaction.** Exxon has not identified any instance of accord-and-satisfaction, which includes a requirement of "conspicuous" notice of the claim being settled. In the absence of Exxon's pointing to specific instances of accord and satisfaction, this is a merely hypothetical concern and should not affect certification.

**Release.** The issue whether exceptions for "trade accounts" and "reimbursement" remove the claims in this case from the release will be a common legal question for the Court. On the record thus far, the

issue of whether dealers knew or should have known rests from both parties' perspectives on common evidence (Exxon claims it told all dealers about the rebilling, the class that Exxon did not).

*Notice.* There is a common factual question as to what constitutes "reasonable" notice under the Code given a program based upon common written documents, and the common practices surrounding the costs Exxon did add to the DTT price. For purposes of this certification motion, Exxon has argued that what dealers knew is an individual question, but its position is that it told *all* of its dealers that it was "offsetting" rebate costs in the DTT price. For instance, Exxon relies on the testimony of employee James Carter, who testified that "we introduced a rebate and we talked to the dealer advisory council which represented New Orleans as well as the rest of the country about rebates, and they were fully aware it would be offset in the DTT." Exxon Opposition at 35. Among the documents on which Exxon relied at the certification hearing is a script for a New Jersey area pricing test, Exxon Sur–Reply Ex. 13—which could only relate to Texas dealers on an even peripheral basis if Exxon had uniform practices nationwide; Ex. 14, minutes from a 1989 National Dealer Advisory Council Meeting, and Ex. 15, Minutes from a 1990 National Dealer Advisory Council. Because none of the class representatives or class members gave the presuit notice Exxon claims is required by the Sales Agreements or the notice that Exxon claims is required under the UCC, this too is a common question for the class.

***Limitations and Fraudulent Concealment.*** For the same reasons, whether Exxon fraudulently concealed its rebilling and so tolled limitations is a common issue that will be determined by company wide evidence about the common scripts that Exxon sent to its dealers.[15]

## VIII. Conclusion

Based on the findings and conclusions set out above, this Court grants Plaintiffs' Motion for Class Certification and certifies this class of Exxon dealers who "are and/or were at the material times Exxon-branded retail service station dealers who owned or operated Exxon branded retail motor fuel stores in the state of Texas and who entered into a standardized contract or agreement with ExxonMobil" during the pendency of the volume and 24–hour rebate programs listed in the Second Amended Original Class Action Petition.

**15.** In *Allapattah,* Exxon argued that fraudulent concealment had to be argued on a case by case basis in thousands of trials. *Allapattah,* 188 F.R.D. at 670. Exxon claimed that refusing to do so would deprive it of due process. *Id.* Yet the court found that, based on Exxon's common practices, "the factual disputes arising from the fraudulent conceal-ment doctrine can be properly resolved on a class-wide basis by the jury in deciding the remaining class-wide issues." *Id.* at 673. The same is true here in a case involving the same basic common structure of Exxon dealer communications; a different substantive claim, and a much smaller class.